# CITY OF LAKEWOOD *v.* PLAIN DEALER PUBLISHING CO.

No. 86–1042.   Argued November 4, 1987—Decided June 17, 1988

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, and SCALIA, JJ., joined. WHITE, J., filed a dissenting opinion, in which STEVENS and O'CONNOR, JJ., joined, *post*, p. 772. REHNQUIST, C. J., and KENNEDY, J., took no part in the consideration or decision of the case.

*Henry B. Fischer* argued the cause for appellant. With him on the briefs were *Frederick W. Whatley* and *Roger D. Tibbetts.*

*James P. Garner* argued the cause for appellee. With him on the briefs were *David L. Marburger, Bruce W. Sanford,* and *Peter C. Gould.**

JUSTICE BRENNAN delivered the opinion of the Court.

The city of Lakewood, a suburban community bordering Cleveland, Ohio, appeals a judgment of the Court of Appeals

*Briefs of *amici curiae* urging reversal were filed for the National Institute of Municipal Law Officers by *William I. Thornton, Jr., Roger F. Cutler, Roy D. Bates, William H. Taube, John W. Witt, Robert J. Alfton, James K. Baker, Joseph N. deRaismes, Frank B. Gummy III, Robert J. Mangler, Neal E. McNeill, Analeslie Muncy, Dante R. Pellegrini, Clifford D. Pierce, Jr.,* and *Charles S. Rhyne;* and for the National League of Cities et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch,* and *Peter Buscemi.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation by *Gordon J. Beggs, John A. Powell, Steven R. Shapiro, Bruce A. Campbell,* and *Paul L. Hoffman;* and for the American Newspaper Publishers Association et al. by *Robb M. Jones, Robert C. Bernius, Peter G. Stone, Lawrence W. Boes, William Niese, Boisfeuillet Jones, Jr., W. Terry Maguire, Tonda F. Rush, Harold W. Fuson, Jr., Alice Neff Lucan,* and *Norton L. Armour.*

for the Sixth Circuit enjoining enforcement of its local ordinance regulating the placement of newsracks. The court's decision was based in part on its conclusion that the ordinance vests the mayor with unbridled discretion over which publishers may place newsracks on public property and where.

I

Prior to 1983, the city of Lakewood absolutely prohibited the private placement of any structure on public property. On the strength of that law, the city denied the Plain Dealer Publishing Company (Newspaper) permission to place its coin-operated newspaper dispensing devices on city sidewalks. In response, the Newspaper brought suit in the District Court for the Northern District of Ohio challenging the ordinance. The District Court adjudged the absolute prohibition unconstitutional, but delayed entering a permanent injunction to give the city time to amend its law.

Although the city could have appealed the District Court's judgment, it decided instead to adopt two ordinances permitting the placement of structures on city property under certain conditions. One of those ordinances specifically concerns newsracks. § 901.181, Codified Ordinances, City of Lakewood (1984).[1] That ordinance gives the mayor the authority to grant or deny applications for annual newsrack permits. If the mayor denies an application, he is required to "stat[e] the reasons for such denial." In the event the mayor grants an application, the city issues an annual permit subject to several terms and conditions. Among them are: (1) approval of the newsrack design by the city's Architectural Board of Review; (2) an agreement by the newsrack owner to indemnify the city against any liability arising from the newsrack, guaranteed by a $100,000 insurance policy to

---

[1] The other ordinance deals with all other structures and is unchallenged. § 901.18, Codified Ordinances, City of Lakewood (1984).

that effect; and (3) any "other terms and conditions deemed necessary and reasonable by the Mayor."[2]

Dissatisfied with the new ordinance, the Newspaper elected not to seek a permit, and instead amended its complaint in the District Court to challenge facially the law as amended. The District Court found the ordinance constitutional in its entirety, and entered judgment in the city's favor.

---

[2] The portions of the ordinance relevant to this appeal are as follows:

"901.181 NEWSPAPER DISPENSING DEVICES; PERMIT AND APPLICATION

"Applications may be made to and on forms approved by the Mayor for rental permits allowing the installation of newspaper dispensing devices on public property along the streets and thoroughfares within the City respecting newspapers having general circulation throughout the City.

"The Mayor shall either deny the application, stating the reasons for such denial or grant said permit subject to the following terms:

"(a) . . . The design of [newsracks] shall be subject to approval by the Architectural Board of Review.

"(b) Newspaper dispensing devices shall not be placed in the residential use districts of the City . . . .

"(c) The rental permit shall be granted upon the following conditions:

"(5) the permittee shall save and hold the City of Lakewood harmless from any and all liability for any reason whatsoever occasioned upon the installation and use of each newspaper dispensing device and shall furnish, at permittee's expense, such public liability insurance as will protect permittee and the City from all claims for damage to property or bodily injury, including death, which may arise from the operation under the permit or in connection therewith and such policy . . . shall be in an amount not less than One Hundred Thousand Dollars ($100,000) . . . .

"(6) rental permits shall be for a term of one year and shall not be assignable; and

"(7) such other terms and conditions deemed necessary and reasonable by the Mayor.

"(e) A person aggrieved by a decision of the Mayor in refusing to grant or revoking a rental permit shall have the right to appeal to Council . . . ."

The ordinance is quoted in full in the opinion below. 794 F. 2d 1139, 1141, n. 1 (CA6 1986).

The Court of Appeals for the Sixth Circuit reversed, finding the ordinance unconstitutional in three respects. First, it held that the ordinance gives the mayor unbounded discretion to grant or deny a permit application and to place unlimited additional terms and conditions on any permit that issues. Second, it concluded that in the absence of any express standards governing newsrack design, the design approval requirement effectively gives the Board unbridled discretion to deny applications. Finally, a majority of the panel decided that the indemnity and insurance requirements for newsrack owners violate the First Amendment because no similar burdens are placed on owners of other structures on public property.[3] The court found that the foregoing provisions of the law were not severable, and therefore held the entire ordinance unconstitutional insofar as it regulates newsracks in commercial districts.[4] The city appealed, and we noted probable jurisdiction. 480 U. S. 904 (1987).

## II

At the outset, we confront the issue whether the Newspaper may bring a facial challenge to the city's ordinance. We conclude that it may.

## A

Recognizing the explicit protection accorded speech and the press in the text of the First Amendment, our cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first apply-

---

[3] The city asserts that it will apply the indemnity and insurance requirements to all structures on public property except as to the public utilities (telephone booths, utility poles, and bus shelters) already extant on public property when § 901.181 was enacted.

[4] The court decided that the absolute ban on residential newsrack placements was both constitutional and severable. Its decision in that respect is not challenged here.

ing for, and being denied, a license.[5]  *E. g., Freedman* v. *Maryland,* 380 U. S. 51, 56 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, *whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license"*) (emphasis added); *Thornhill* v. *Alabama,* 310 U. S. 88, 97 (1940) (in the First Amendment context, "[o]ne who might have had a license for the asking may . . . call into question the whole scheme of licensing when he is prosecuted for failure to procure it"). See also *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 151 (1969) ("'The Constitution can hardly be thought to deny to one subjected to the restraints of [a licensing law] the right to attack its constitutionality, because he has not yielded to its demands'" (quoting *Jones* v. *Opelika,* 316 U. S. 584, 602 (1942) (Stone, C. J., dissenting), adopted *per curiam* on rehearing, 319 U. S. 103, 104 (1943))); *Lovell* v. *Griffin,* 303 U. S. 444, 452–453 (1938) ("As the ordinance [providing for unbridled licensing discretion] is void on its face, it was not necessary for appellant to seek a permit under it"); cf. *Secretary of State of Md.* v. *Joseph H. Munson Co.,* 467 U. S. 947, 956–957 (1984).[6]

---

[5] Of course, the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away. *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376, 385 (1973).

[6] In general, compare *Plymouth Coal Co.* v. *Pennsylvania,* 232 U. S. 531 (1914) (coal mining), *Yazoo & Mississippi Valley R. Co.* v. *Jackson Vinegar Co.,* 226 U. S. 217 (1912) (railroad), and *New York ex rel. Lieberman* v. *Van De Carr,* 199 U. S. 552 (1905) (dairy business), all requiring challenges "as applied," with *Secretary of State of Md.* v. *Joseph H. Munson Co.,* 467 U. S., at 964–968 (charity solicitation), *Hynes* v. *Mayor of Oradell,* 425 U. S. 610 (1976) (registration requirement for political candidate or charity solicitation door to door), *Shuttlesworth* v. *Birmingham,* 394 U. S. 147 (1969) (parade), *Freedman* v. *Maryland,* 380 U. S. 51 (1965) (film censorship), *Talley* v. *California,* 362 U. S. 60 (1960) (handbills), *Saia*

At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship. *E. g., Shuttlesworth, supra,* at 151; *Cox* v. *Louisiana,* 379 U. S. 536 (1965); *Staub* v. *City of Baxley,* 355 U. S. 313, 321–322 (1958); *Kunz* v. *New York,* 340 U. S. 290, 294 (1951); *Niemotko* v. *Maryland,* 340 U. S. 268 (1951); *Saia* v. *New York,* 334 U. S. 558 (1948). And these evils engender identifiable risks to free expression that can be effectively alleviated only through a facial challenge. First, the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused. As we said in *Thornhill:*

> "Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas. . . . The power of the licensor against which John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing' is pernicious not merely by reason of the censure of particular comments but by the reason of the *threat to censure comments on matters of public concern.* It is not merely the sporadic abuse of power by the censor *but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion."* 310 U. S., at 97 (emphases added).

See also *Freedman, supra.* Self-censorship is immune to an "as applied" challenge, for it derives from the individual's own actions, not an abuse of government power. It is not difficult to visualize a newspaper that relies to a substantial degree on single issue sales feeling significant pressure to endorse the incumbent mayor in an upcoming election, or to re-

---

v. *New York,* 334 U. S. 558 (1948) (sound trucks), and *Lovell* v. *Griffin,* 303 U. S. 444 (1938) (leaflets), all allowing facial challenges.

frain from criticizing him, in order to receive a favorable and speedy disposition on its permit application. Only standards limiting the licensor's discretion will eliminate this danger by adding an element of certainty fatal to self-censorship. Cf. *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 498 (1982) (vagueness doctrine). And only a facial challenge can effectively test the statute for these standards.

Second, the absence of express standards makes it difficult to distinguish, "as applied," between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power. Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech. Without these guideposts, *post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression. See, *e. g.*, *Joseph H. Munson Co.*, *supra*, at 964, n. 12; *Cox* v. *Louisiana*, *supra*, at 557. Further, the difficulty and delay inherent in the "as applied" challenge can itself discourage litigation. A newspaper espousing an unpopular viewpoint on a shoestring budget may be the likely target for a retaliatory permit denial, but may not have the time or financial means to challenge the licensor's action. That paper might instead find it easier to capitulate to what it perceives to be the mayor's preferred viewpoint, or simply to close up shop. Even if that struggling paper were willing and able to litigate the case successfully, the eventual relief may be "too little and too late." Until a judicial decree to the contrary, the licensor's prohibition stands. In the interim, opportunities for speech are irretrievably lost. *Freedman*, *supra*, at 57; see also *Saia*, *supra*, at 560; *Cantwell* v. *Connecticut*, 310 U. S. 296, 306 (1940). In sum, without standards to fetter the licensor's discretion, the difficulties of proof and the

case-by-case nature of "as applied" challenges render the licensor's action in large measure effectively unreviewable.

## B

The foregoing concepts form the heart of our test to distinguish laws that are vulnerable to facial challenge from those that are not. As discussed above, we have previously identified two major First Amendment risks associated with unbridled licensing schemes: self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship "as applied" without standards by which to measure the licensor's action. It is when statutes threaten these risks to a significant degree that courts must entertain an immediate facial attack on the law. Therefore, a facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers. This is not to say that the press or a speaker may challenge as censorship any law involving discretion to which it is subject. The law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks.

The regulatory scheme in the present case contains two features which, at least in combination, justify the allowance of a facial challenge. First, Lakewood's ordinance requires that the Newspaper apply annually for newsrack licenses. Thus, it is the sort of system in which an individual must apply for multiple licenses over time, or periodically renew a license. When such a system is applied to speech, or to conduct commonly associated with speech, the licensor does not necessarily view the text of the words about to be spoken, but can measure their probable content or viewpoint by speech already uttered. See *Saia* v. *New York, supra.* A speaker in this position is under no illusion regarding the

effect of the "licensed" speech on the ability to continue speaking in the future. Yet demonstrating the link between "licensed" expression and the denial of a later license might well prove impossible. While perhaps not as direct a threat to speech as a regulation allowing a licensor to view the actual content of the speech to be licensed or permitted, see *Freedman* v. *Maryland,* 380 U. S. 51 (1965); *Cox* v. *Louisiana,* 379 U. S. 536 (1965); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58 (1963), a multiple or periodic licensing requirement is sufficiently threatening to invite judicial concern.

A second feature of the licensing system at issue here is that it is directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers. Such a framework creates an agency or establishes an official charged particularly with reviewing speech, or conduct commonly associated with it, breeding an "expertise" tending to favor censorship over speech. *Freedman, supra.* Indeed, a law requiring the licensing of printers has historically been declared the archetypal censorship statute. See 4 W. Blackstone, Commentaries *152. Here again, without standards to bound the licensor, speakers denied a license will have no way of proving that the decision was unconstitutionally motivated, and, faced with that prospect, they will be pressured to conform their speech to the licensor's unreviewable preference.

Because of these features in the regulatory system at issue here, we think that a facial challenge is appropriate, and that standards controlling the mayor's discretion must be required. Of course, the city may require periodic licensing, and may even have special licensing procedures for conduct commonly associated with expression; but the Constitution requires that the city establish neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered.

In contrast to the type of law at issue in this case, laws of general application that are not aimed at conduct commonly

associated with expression and'do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken, carry with them little danger of censorship. For example, a law requiring building permits is rarely effective as a means of censorship. To be sure, on rare occasion an opportunity for censorship will exist, such as when an unpopular newspaper seeks to build a new plant. But such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse. And if such charges are made, the general application of the statute to areas unrelated to expression will provide the courts a yardstick with which to measure the licensor's occasional speech-related decision.

The foregoing discussion explains why the dissent's analogy between newspapers and soda vendors is inapposite. See *post*, at 788–789. Newspapers are in the business of expression, while soda vendors are in the business of selling soft drinks. Even if the soda vendor engages in speech, that speech is not related to the soda; therefore preventing it from installing its machines may penalize unrelated speech, but will not directly prevent that speech from occurring. In sum, a law giving the mayor unbridled discretion to decide which soda vendors may place their machines on public property does not vest him with frequent opportunities to exercise substantial power over the content or viewpoint of the vendor's speech by suppressing the speech or directly controlling the vendor's ability to speak.

The proper analogy is between newspapers and leaflets. It is settled that leafletters may facially challenge licensing laws. See, *e. g., Talley* v. *California*, 362 U. S. 60 (1960); *Lovell* v. *Griffin*, 303 U. S. 444 (1938). This settled law is based on the accurate premise that peaceful pamphleteering "is not fundamentally different from the function of a newspaper." *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 419 (1971); see also *Lovell, supra*, at 450–452. The dissent's theory therefore would turn the law on its head. That

result cannot be justified by relying on the meaningless distinction that here the newspapers are ultimately distributed by a machine rather than by hand. First, the ordinance held invalid in *Lovell* applied to distribution "by hand or otherwise." 303 U. S., at 447. The Court did not even consider holding the law invalid only as to distribution by hand. Second, such a distinction makes no sense in logic or theory. The effectiveness of the newsrack as a means of distribution, especially for low-budget, controversial neighborhood newspapers, means that the twin threats of self-censorship and undetectable censorship are, if anything, greater for newsracks than for pamphleteers. Cf. *Schneider* v. *State*, 308 U. S. 147, 164 (1939) (relying on the effectiveness of pamphleteering); *Martin* v. *Struthers*, 319 U. S. 141, 145–146 (1943) (same).

## C

In an analysis divorced from a careful examination of the unique risks associated with censorship just discussed and their relation to the law before us, the dissent reasons that if a particular manner of speech may be prohibited entirely, then no "activity protected by the First Amendment" can be implicated by a law imposing less than a total prohibition. It then finds that a total ban on newsracks would be constitutional. Therefore, the dissent concludes, the actual ordinance at issue involves no "activity protected by the First Amendment," and thus is not subject to facial challenge. However, that reasoning is little more than a legal sleight-of-hand, misdirecting the focus of the inquiry from a law allegedly vesting unbridled censorship discretion in a government official toward one imposing a blanket prohibition.[7]

The key to the dissent's analysis is its "greater-includes-the-lesser" syllogism. But that syllogism is blind to the rad-

---

[7] Because we reject the dissent's overall logical framework, we do not pass on its view that a city may constitutionally prohibit the placement of newsracks on public property.

ically different constitutional harms inherent in the "greater" and "lesser" restrictions.[8] Presumably in the case of an ordinance that completely prohibits a particular manner of expression, the law on its face is both content and viewpoint neutral. In analyzing such a hypothetical ordinance, the Court would apply the well-settled time, place, and manner test. *E. g.*, *Consolidated Edison Co.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 535 (1980); *Police Department of Chicago* v. *Mosley*, 408 U. S. 92 (1972). The danger giving rise to the First Amendment inquiry is that the government is silencing or restraining a channel of speech; we ask whether some interest unrelated to speech justifies this silence. To put it another way, the question is whether "the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned* v. *City of Rockford*, 408 U. S. 104, 116 (1972).

In contrast, a law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official. As demonstrated above, we have often and uniformly held that such statutes or policies impose censorship on the public or the press, and hence are unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of

---

[8] The dissent informs us that it abjures any reliance on a "greater-includes-the-lesser" theory. Yet in the very next sentence we are told that "where an activity . . . could be forbidden altogether (without running afoul of the First Amendment)," then for that reason alone, "the *Lovell-Freedman* doctrine does not apply, and our usual rules concerning the permissibility of discretionary local licensing laws (and facial challenges to those laws) must prevail." *Post*, at 786. In other words, the greater power to prohibit a manner of speech entirely includes the lesser power to license it in an official's unbridled discretion. A clearer example of the discredited doctrine could not be imagined.

the speaker. *E. g.*, *Cox* v. *Louisiana*, 379 U. S., at 557; *Staub*, 355 U. S., at 322. Therefore, even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion. It bears repeating that "[i]n the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *Freedman*, 380 U. S., at 56. Fundamentally, then, the dissent's proposal ignores the different concerns animating our test to determine whether an expressive activity may be banned entirely, and our test to determine whether it may be licensed in an official's unbridled discretion.

This point is aptly illustrated by a comparison of two of our prior cases: *Saia* v. *New York*, 334 U. S. 558 (1948), and *Kovacs* v. *Cooper*, 336 U. S. 77 (1949). In *Saia*, this Court held that an ordinance prohibiting the use of sound trucks without permission from the Chief of Police was unconstitutional because the licensing official was able to exercise unbridled discretion in his decisionmaking, and therefore could, in a calculated manner, censor certain viewpoints. Just seven months later the Court held in *Kovacs* that a city could absolutely ban the use of sound trucks. The plurality distinguished *Saia* precisely on the ground that there the ordinance constituted censorship by allowing some to speak, but not others; in *Kovacs* the statute barred a particular manner of speech for all. 336 U. S., at 80 (plurality opinion of Reed, J.).[9]

---

[9] The dissent suggests that the *Kovacs* plurality's distinction of *Saia* is somehow not good law because four other Justices (three of whom were in dissent) adopted the far broader rationale that *Saia* was actually repudi-

*Saia* is irreconcilable with the logic the dissent now puts forward. Under the dissent's novel rule, the Court in *Saia* should first have determined whether the use of sound trucks could be prohibited completely. If so, as was held in *Kovacs*, the Court should have rejected the constitutional facial chal-

---

ated. JUSTICE WHITE's interpretation of *Kovacs* does not square with our settled jurisprudence: when no single rationale commands a majority, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgmen[t] on the narrowest grounds." *Marks* v. *United States*, 430 U. S. 188, 193 (1977). Clearly, in *Kovacs* the plurality opinion put forth the narrowest rationale for the Court's judgment. In any event, history has vindicated the plurality's distinction. *Saia* has been cited literally hundreds of times in its 40-year history (a strange phenomenon had that case been "repudiated"), and never with the notation "overruled on other grounds." See, *e. g.*, *Joseph H. Munson Co.*, 467 U. S., at 965, n. 13 (citing *Saia* for the proposition that where a law on its face presents an unacceptable risk of the suppression of ideas, that law may be struck on its face); *Schad* v. *Mount Ephraim*, 452 U. S. 61, 84 (1981) (STEVENS, J., concurring in judgment) ("Presumably, municipalities may regulate expressive activity—even protected activity—pursuant to narrowly drawn content-neutral standards; however, they may not regulate protected activity when the only standard provided is the unbridled discretion of a municipal official. Compare *Saia* v. *New York*, 334 U. S. 558, with *Kovacs* v. *Cooper*, 336 U. S. 77"); *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976) (*Kovacs* and *Saia* compared in course of a string cite to illustrate that the Court approves time, place, and manner restrictions that are content neutral); *Kunz* v. *New York*, 340 U. S. 290, 294 (1951) (opinion of the Court by Vinson, C. J., joined by Reed, Douglas, Burton, Clark, and Minton, JJ.) (citing *Saia* for the proposition that a regulation placing unbridled discretion in the hands of a government official over the use of a loudspeaker or amplifier is unconstitutional). Nor has *Saia* been cited merely because *Kovacs* has been ignored. See, *e. g.*, *California* v. *LaRue*, 409 U. S. 109, 117, n. 4 (1972) (*Kovacs* cited for the proposition that "States may validly limit the manner in which the First Amendment freedoms are exercised by forbidding sound trucks in residential neighborhoods"); *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 386–387 (1969) (citing *Kovacs* for the proposition that sound trucks may be neutrally regulated); *Edwards* v. *South Carolina*, 372 U. S. 229, 242 (1963) (Clark, J., dissenting) (*Kovacs* cited for the proposition that there is no right to broadcast from a sound truck on public streets).

lenge. No "activity protected by the First Amendment" (as the dissent defines it) would have been at issue.[10]

The *Kovacs/Saia* comparison provides perhaps the clearest example of the flaw in the dissent's "greater-includes-the-lesser" reasoning. However, in a host of other First Amendment cases we have expressly or implicitly rejected that logic, and have considered on the merits facial challenges to statutes or policies that embodied discrimination based on the content or viewpoint of expression, or vested officials with open-ended discretion that threatened the same, even where it was assumed that a properly drawn law could have greatly restricted or prohibited the manner of expression or circulation at issue.

For instance, in *Mosley* we considered an ordinance banning all picketing near a school *except* labor picketing. The Court declared the law unconstitutional because the ordinance was sensitive to the content of the message. Whether or not the picket could have been prohibited entirely was not dispositive of the Court's inquiry. 408 U. S., at 96–99. Similarly, in *Flower* v. *United States*, 407 U. S. 197 (1972), the Court summarily reversed a conviction based on Flower's return to a military facility to leaflet after having been ordered to leave once before. It was never doubted that a military commander may generally restrict access to a military facility. But, where the base was for all other purposes treated as part of the surrounding city, the Court refused to allow the commander unbridled discretion to prohibit Flower's leafletting. In *Schacht* v. *United States*, 398 U. S. 58 (1970), the Court struck down a statute permitting actors to wear a military uniform in a theater or motion picture pro-

---

[10] *Saia* cannot be distinguished from the instant case on the theory that it involved a criminal prosecution. It would be foolish indeed, and contrary to the federal courts' declaratory judgment authorization, 28 U. S. C. § 2201 (1982 ed., Supp. IV), to require the Newspaper to place a newsrack on city property illegally in order to obtain standing to challenge the ordinance. Cf. *Steffel* v. *Thompson*, 415 U. S. 452 (1974).

duction only "if the portrayal does not tend to discredit that armed force." The Court noted that although a total prohibition would be valid, a prohibition sensitive to the viewpoint of speech could not stand. *Niemotko* provides yet another example of the Court's rejection of "greater-includes-the-lesser" logic in the First Amendment area. There, a Jehovah's Witness was convicted of disorderly conduct after speaking in a park without a license. The Court decided that whatever power a city might have to prohibit *all* religious speech in its parks, it could not allow some but not all religious speech, depending on the exercise of unbridled discretion. 340 U. S., at 272–273. Or, as Justice Frankfurter put it in his concurring opinion, "[a] licensing standard which gives an official authority to censor the content of speech differs *toto cœlo* from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like." *Id.*, at 282. Cf. *Widmar* v. *Vincent*, 454 U. S. 263 (1981) (public university need not create a public forum, but having done so, it may not restrict access so as to exclude some groups based on the religious content of their speech without constitutional justification); *Madison Joint School District* v. *Wisconsin Employment Relations Comm'n*, 429 U. S. 167 (1976) (School Board need not create a public forum, but having done so, it cannot restrict who may speak based on the content or viewpoint of the speech). To counter this unanimous line of authority, the dissent does not refer to a single case supporting its view that we cannot consider a facial challenge to an ordinance alleged to constitute censorship over constitutionally protected speech merely because the manner used to circulate that speech might be otherwise regulated or prohibited entirely.

Ultimately, then, the dissent's reasoning must fall of its own weight. As the preceding discussion demonstrates, this Court has long been sensitive to the special dangers inherent in a law placing unbridled discretion directly to license speech, or conduct commonly associated with speech, in the

hands of a government official. In contrast, when the government is willing to prohibit a particular manner of speech entirely—the speech it favors along with the speech it disfavors—the risk of governmental censorship is simply not implicated. The "greater" power of outright prohibition raises other concerns, and we have developed tests to consider them. But we see no reason, and the dissent does not advance one, to ignore censorship dangers merely because other, unrelated concerns are satisfied.

The dissent compounds its error by defining an "activity protected by the First Amendment" by the time, place, or (in this case) manner by which the activity is exercised. The actual "activity" at issue here is the circulation of newspapers, which is constitutionally protected. After all, "[l]iberty of circulating is as essential to [freedom of expression] as liberty of publishing; indeed, without the circulation, the publication would be of little value." *Ex parte Jackson*, 96 U. S. 727, 733 (1878); *Lovell*, 303 U. S., at 452.

The dissent's recharacterization of the issue is not merely semantic; substituting the time, place, or manner for the activity itself allows the dissent to define away a host of activities commonly considered to be protected. The right to demonstrate becomes the right to demonstrate at noise levels proscribed by law; the right to parade becomes the right to parade anywhere in the city 24 hours a day; and the right to circulate newspapers becomes the right to circulate newspapers by way of newsracks placed on public property. Under the dissent's analysis, ordinances giving the Mayor unbridled discretion over whether to permit loud demonstrations or evening parades would not be vulnerable to a facial challenge, since they would not "requir[e] a license to engage in activity protected by the First Amendment." *Post*, at 777. But see *Grayned*, 408 U. S., at 113 (implying that a law banning excessively loud demonstrations was not facially invalid because its terms could not invite "subjective or discriminatory enforcement").

Moreover, we have never countenanced such linguistic prestidigitation, even where a regulation or total prohibition of the "manner" of speech has been upheld. In determining whether expressive conduct is at issue in a censorship case, we do not look solely to the time, place, or manner of expression, but rather to whether the activity in question is commonly associated with expression. For example, in *Kovacs*, it was never doubted that the First Amendment's protection of expression was *implicated* by the ordinance prohibiting sound trucks. The Court simply concluded that the First Amendment was not *abridged*. 336 U. S., at 87. See also *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789 (1984). So here, the First Amendment is certainly implicated by the city's circulation restriction; the question we must resolve is whether the First Amendment is abridged.

## III

Having concluded that the Newspaper may facially challenge the Lakewood ordinance, we turn to the merits. Section 901.181, Codified Ordinances, City of Lakewood, provides: "The Mayor shall either deny the application [for a permit], stating the reasons for such denial or grant said permit subject to the following terms . . . ." Section 901.181 (c) sets out some of those terms, including: "(7) such other terms and conditions deemed necessary and reasonable by the Mayor." It is apparent that the face of the ordinance itself contains no explicit limits on the mayor's discretion. Indeed, nothing in the law as written requires the mayor to do more than make the statement "it is not in the public interest" when denying a permit application. Similarly, the mayor could grant the application, but require the newsrack to be placed in an inaccessible location without providing any explanation whatever. To allow these illusory "constraints" to constitute the standards necessary to bound a licensor's discretion renders the guarantee against censorship little

more than a high-sounding ideal. See *Shuttlesworth*, 394 U. S., at 150–151.

The city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to standards absent from the ordinance's face. But this is the very presumption that the doctrine forbidding unbridled discretion disallows. *E. g., Freedman* v. *Maryland*, 380 U. S. 51 (1965). The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice. *Poulos* v. *New Hampshire*, 345 U. S. 395 (1953); *Kunz* v. *New York*, 340 U. S. 290 (1951). This Court will not write nonbinding limits into a silent state statute.[11]

---

[11] Some have argued, unpersuasively, that pre-enforcement challenges, like this one, unfairly deprive the city of the chance to obtain a constitutional state-court construction or to establish a local practice. It is true that when a state law has been authoritatively construed so as to render it constitutional, or a well-understood and uniformly applied practice has developed that has virtually the force of a judicial construction, the state law is read in light of those limits. That rule applies even if the face of the statute might not otherwise suggest the limits imposed. *Poulos* v. *New Hampshire*, 345 U. S. 395 (1953). Further, this Court will presume any narrowing construction or practice to which the law is "fairly susceptible." *Erznoznik* v. *City of Jacksonville*, 422 U. S. 205 (1975); *Broadrick* v. *Oklahoma*, 413 U. S. 601, 617–618 (1973). But we have never held that a federal litigant must await a state-court construction or the development of an established practice before bringing the federal suit. Cf. *Houston* v. *Hill*, 482 U. S. 451 (1987) (declining to abstain or order certification to allow the state courts to construe a criminal statute where the statute was not fairly susceptible to a narrowing construction).

Once it is agreed that a facial challenge is permissible to attack a law imposing censorship, nothing is gained by requiring one actually denied a license to bring the action. Facial attacks, by their nature, are not dependent on the facts surrounding any particular permit denial. Thus, waiting for an alleged abuse before considering a facial challenge would

Although the dissent disclaims a desire to pass upon the actual ordinance at issue, it apparently cannot resist making a few comments in this regard. *Post*, at 793, n. 13. First, it asserts that the ordinance's requirement that the mayor state his reasons for denying a permit distinguishes this case from other licensing cases. However, the mayor's statement need not be made with any degree of specificity, nor are there any limits as to what reasons he may give. Such a minimal requirement cannot provide the standards necessary to insure constitutional decisionmaking, nor will it, of necessity, provide a solid foundation for eventual judicial review.

The dissent is also comforted by the availability of judicial review. However, that review comes only after the mayor and the City Council have denied the permit. Nowhere in the ordinance is either body required to act with reasonable dispatch. Rather, an application could languish indefinitely before the Council, with the Newspaper's only judicial remedy being a petition for mandamus. Cf. *Freedman, supra*, at 54–55, 59. Even if judicial review were relatively speedy, such review cannot substitute for concrete standards to guide the decisionmaker's discretion. *E. g., Saia*, 334 U. S., at 560, and *supra*, at 759–760.

Finally, the dissent attempts to distinguish newsrack permits from parade permits in that the latter are often given for a particular event or time, whereas the former supposedly have no urgency. This overstates the proposition. We agree that in some cases there is exceptional force to the argument that a permit delayed is a permit denied. However, we cannot agree that newspaper publishers can wait indefinitely for a permit only because there will always be news to report. News is not fungible. Some stories may be particularly well covered by certain publications, providing that newspaper with a unique opportunity to develop readership. In order to benefit from that event, a paper needs public

achieve nothing except to allow the law to exist temporarily in a limbo of uncertainty and to risk censorship of free expression during the interim.

access at a particular time; eventual access would come "too little and too late." *Freedman, supra,* at 57. The Plain Dealer has been willing to forgo this benefit for four years in order to bring and litigate this lawsuit. However, smaller publications may not be willing or able to make the same sacrifice.

## IV

We hold those portions of the Lakewood ordinance giving the mayor unfettered discretion to deny a permit application and unbounded authority to condition the permit on any additional terms he deems "necessary and reasonable," to be unconstitutional. We need not resolve the remaining questions presented for review, as our conclusion regarding mayoral discretion will alone sustain the Court of Appeals' judgment if these portions of the ordinance are not severable from the remainder. Severability of a local ordinance is a question of state law, and is therefore best resolved below. See *Mayflower Farms, Inc.* v. *Ten Eyck,* 297 U. S. 266, 274 (1936). Accordingly, we remand this cause to the Court of Appeals to decide whether the provisions of the ordinance we have declared unconstitutional are severable, and to take further action consistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE and JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE WHITE, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, dissenting.

Today the majority takes an extraordinary doctrine, developed cautiously by this Court over the past 50 years, and applies it to a circumstance, and in a manner, that is without precedent. Because of this unwarranted expansion of our previous cases, I dissent.

## I

At the outset, it is important to set forth the general nature of the dispute.

The Court quite properly does *not* establish any constitutional right of newspaper publishers to place newsracks on municipal property. The Court expressly declines to "pass" on the question of the constitutionality of an outright municipal ban on newsracks. *Ante*, at 762, n. 7. My approach to the specific question before us, which differs from that of the majority, requires me to consider this question; and, as discussed below, our precedents suggest that an outright ban on newsracks on city sidewalks would be constitutional, particularly where (as is true here) ample alternative means of 24-hour distribution of newspapers exist. In any event, the Court's ruling today cannot be read as any indication to the contrary: cities remain free after today's decision to enact such bans.

Moreover, the Court expressly rejects the view, heretofore adopted by some lower courts, that any local scheme that seeks to license the placement of newsracks on public property is *per se* unconstitutional.[1] Cities "may require periodic licensing, and may even have special licensing procedures for conduct commonly associated with expression." *Ante*, at 760. It is only common sense that cities be allowed to exert some control over those who would permanently appropriate city property for the purpose of erecting a newspaper dispensing device.

My disagreement with the Court is not over the constitutional status of newsracks, or the more specific question of the propriety of the licensing of such newspaper vending devices. The dispute in this case is over a more "technical" question: What is the scope of the peculiar doctrine that governs facial challenges to local laws in the First Amendment area? The majority reads our cases as holding that local licensing laws which have "a close enough nexus to expression, or to conduct commonly associated with expression, to

---

[1] See, *e. g.*, *Minnesota Newspaper Assn.* v. *Minneapolis*, 9 Med. L. Rptr. 2116, 2122–2123 (DC Minn. 1983); *Gannett Co.* v. *City of Rochester*, 69 Misc. 2d 619, 330 N. Y. S. 2d 648 (1972).

pose a real and substantial threat of [an] identified censorship ris[k]," will be considered invalid "whenever [such a law] gives a government official . . . substantial power to discriminate based on the content or viewpoint of speech." *Ante,* at 759. This is true, the majority believes, whether or not the speaker can prove that the official's power has been or will be used against him; indeed, it is true even if the government official indicates a willingness to abjure the use of such power (as is the case here).

It is true that certain licensing laws that "giv[e] a government official . . . substantial power to discriminate based on the content or viewpoint of speech" are unconstitutional on their face—without any showing of actual censorship or discrimination, or even without the potential licensee even making an application for a license. But the sweep of this potent doctrine must be limited in a way that is principled; one that is rooted in our precedents and our history. The Court's statement that this doctrine applies *whenever* the license law has "a close . . . nexus to expression, or to conduct commonly associated with expression," is unduly broad. The doctrine, as I see it, applies only when the specific conduct which the locality seeks to license is protected by the First Amendment. Because the placement of newsracks on city property is not so protected (as opposed to the circulation of newspapers as a general matter), the exception to our usual facial challenge doctrine does not apply here.

## II

Our prior cases, and an examination of the case before us, indicate that the Lakewood ordinance is not invalid because it vests "excessive discretion" in Lakewood's mayor to grant or deny a newsrack permit.

### A

The Court has historically been reluctant to entertain facial attacks on statutes, *i. e.,* claims that a statute is invalid in all of its applications. Our normal approach has been to deter-

mine whether a law is unconstitutional as applied in the particular case before the Court.[2]   This rule is also the usual approach we follow when reviewing laws that require licenses or permits to engage in business or other activities. In *New York ex rel. Lieberman* v. *Van De Carr*, 199 U. S. 552 (1905), for example, plaintiff in error was convicted of selling milk in New York City without a permit.   Plaintiff in error claimed before this Court that the licensing law vested arbitrary power in an administrative board to select those who would be permitted to sell milk.   This Court's response was:

> "[Prior] cases leave in no doubt the proposition that the conferring of discretionary power upon administrative boards to grant or withhold permission to carry on a trade or business which is the proper subject of regulation within the police power of the state is not violative of rights secured by the Fourteenth Amendment. There is no presumption that the power will be arbitrarily exercised, and when it is shown to be thus exercised against the individual, under sanction of state authority this court has not hesitated to interfere for his protection, when the case has come before it in such manner as to authorize the interference of a Federal court."   *Id.,* at 562.

There being no showing that the law had been unconstitutionally applied to plaintiff in error, his conviction was affirmed.   "One who is required to take out a license will not be heard to complain, in advance of application, that there is a danger of refusal.   He should apply and see what hap-

---

[2] See, *e. g., Brockett* v. *Spokane Arcades, Inc.,* 472 U. S. 491, 501–503 (1985); *United States* v. *Grace,* 461 U. S. 171, 175 (1983); *Nixon* v. *Administrator of General Services,* 433 U. S. 425, 438–439 (1977); *Joseph E. Seagram & Sons, Inc.* v. *Hostetter,* 384 U. S. 35, 52 (1966); *United States* v. *Raines,* 362 U. S. 17, 20–24 (1960); *Watson* v. *Buck,* 313 U. S. 387, 402 (1941).

pens." *Highland Farms Dairy, Inc.* v. *Agnew*, 300 U. S. 608, 616–617 (1937) (citations omitted). Other cases are to the same effect.[3] Thus, the usual rule is that a law requiring permits for specified activities is not unconstitutional because it vests discretion in administrative officials to grant or deny the permit. The Constitution does not require the Court to assume that such discretion will be illegally exercised. *Douglas* v. *Noble*, 261 U. S. 165, 170 (1923); *Lieberman, supra,* at 562.[4]

There are, however, a few well-established contexts in which the Court has departed from its insistence on an as-applied approach to constitutional adjudication. One of them is where a permit or license is required to engage in expressive activities protected by the First Amendment, and official discretion to grant or deny is not suitably confined. "In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a

---

[3] See, *e. g., Independent Warehouses, Inc.* v. *Scheele*, 331 U. S. 70, 88 (1947); *Smith* v. *Cahoon*, 283 U. S. 553, 562 (1931); *Douglas* v. *Noble*, 261 U. S. 165, 170 (1923); *Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531, 544–545 (1914); *Bradley* v. *Richmond*, 227 U. S. 477, 482–483 (1913); *Western Union Telegraph Co.* v. *Richmond*, 224 U. S. 160, 168 (1912); *Fischer* v. *St. Louis*, 194 U. S. 361, 371 (1904); *Baer* v. *City of Wauwatosa*, 716 F. 2d 1117, 1123–1124 (CA7 1983); *Spanish International Broadcasting Co.* v. *FCC*, 128 U. S. App. D. C. 93, 104, 385 F. 2d 615, 626 (1967); *Wallach* v. *City of Pagedale*, 376 F. 2d 671, 674–675 (CA8 1967).

[4] Confining our attention to the actual impact of a law upon the complaining party is a policy of restraint that rests upon the time-tested advisability of having concrete, rather than hypothetical, cases before us. As a general proposition, we can arrive at informed judgments only when we have a record showing the actual impact of the challenged statute.

Much the same approach underlies the case-or-controversy requirement of Article III. As-applied adjudication also serves the end of deciding no more than necessary to dispose of the specific case under submission and of avoiding unnecessary confrontations with Congress and state or local legislators. Cf. *Ashwander* v. *TVA*, 297 U. S. 288, 346–348 (1936).

license." *Freedman* v. *Maryland*, 380 U. S. 51, 56 (1965).[5] It is this line of cases on which the majority draws to support its conclusion that the Lakewood ordinance is unconstitutional on its face. *Ante*, at 755–758.

The prevailing feature of these exceptional cases, however, is that each of them involved a law that required a license to engage in activity protected by the First Amendment. In each of the cases, the expressive conduct which a city sought to license was an activity which the locality could not prohibit altogether. Streets, sidewalks, and parks are traditional public fora; leafletting, pamphletting, and speaking in such places may be regulated, *Cox* v. *New Hampshire*, 312 U. S. 569, 574–575 (1941); *Cantwell* v. *Connecticut*, 310 U. S. 296, 306–307 (1940); but they may not be entirely forbidden, *Jamison* v. *Texas*, 318 U. S. 413 (1943); *Lovell* v. *Griffin*, 303 U. S. 444 (1938). Likewise, in *Freedman, supra*, at issue was a license requirement that was a prerequisite for any exhibition of a film in the State of Maryland. *Id.*, at 52–53, and n. 1. In all of these cases, the scope of the local license requirement included expressive activity protected by the First Amendment. See also Part II–C, *infra*.

This is how the cases themselves have defined the scope of *Lovell-Freedman* doctrine. Such license requirements are struck down only when they affect the "enjoyment of freedoms which the Constitution guarantees." See *Staub* v. *City of Baxley*, 355 U. S. 313, 322 (1958). It is laws "subjecting the exercise of First Amendment freedoms to" license requirements that we have found suspect, see *Shuttlesworth* v. *Birmingham*, 394 U. S. 147, 150–151 (1969), not merely laws with some amorphous "nexus" to expression.

For example, the *Lovell-Freedman* line of cases would be applicable here if the city of Lakewood sought to license the distribution of all newspapers in the city, or if it required li-

---

[5] See also, *e. g.*, *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 964, n. 12 (1984); *Shuttlesworth* v. *Birmingham*, 394 U. S. 147, 151 (1969); *Cox* v. *Louisiana*, 379 U. S. 536, 557–558 (1965); *Staub* v. *City of Baxley*, 355 U. S. 313, 319 (1958).

censes for all stores which sold newspapers. These are obviously newspaper circulation activities which a municipality cannot prohibit and, therefore, any licensing scheme of this scope would have to pass muster under the *Lovell-Freedman* doctrine. But—and this is critical—Lakewood has not cast so wide a net. Instead, it has sought to license only the placement of newsracks (and other like devices) on city property. As I read our precedents, the *Lovell-Freedman* line of cases is applicable here only if the Plain Dealer has a constitutional right to distribute its papers by means of dispensing devices or newsboxes, affixed to the public sidewalks. I am not convinced that this is the case.

### B

Appellee has a right to distribute its newspapers on the city's streets, as others have a right to leaflet, solicit, speak, or proselytize in this same public forum area. But this "does not mean that [appellee] can . . . distribute [its newspapers] where, when and how [it] chooses." See *Breard* v. *Alexandria*, 341 U. S. 622, 642 (1951). More specifically, the Plain Dealer's right to distribute its papers does not encompass the right to take city property—a part of the *public* forum, as appellee so vigorously argues—and appropriate it for its own exclusive use, on a semipermanent basis, by means of the erection of a newsbox.[6] "The publisher of a newspaper . . .

---

[6] Appellee resists this "characterization" of its placement of newsboxes on city property, arguing that it is not seeking to "ren[t]" or have "permanently set aside" portions of the sidewalk for its newsracks. See Tr. of Oral Arg. 37, 47. Rather, appellee contends, it is merely seeking to exercise its "First Amendment right" to distribute newspapers by means of a newsrack, "the mechanical cousin" of the traditional means of selling papers on city streets, the "newsboy." See Brief for Appellee 10; cf. *NLRB* v. *Hearst Publications, Inc.*, 322 U. S. 111, 115–116 (1944).

This "characterization" of its activities is unpersuasive. While newsboxes may not be "permanent" structures in the way that buildings are, they are not a peripatetic presence either. See Tr. of Oral Arg. 37–38; cf. *McDonald* v. *Gannett Publications*, 121 Misc. 2d 90, 90–91, 467 N. Y. S. 2d 300, 301 (1983); Editor & Publisher, Apr. 9, 1983, p. 8., col. 1 (discuss-

has no special privilege to invade the rights and liberties of others," *Associated Press* v. *NLRB*, 301 U. S. 103, 132–133 (1937); these protected "rights of others" have always included the public-at-large's right to use the public forum for its chosen activities, including free passage of the streets. See *Schneider* v. *State*, 308 U. S. 147, 160 (1939).

From the outset of its contemporary public forum cases, this Court has recognized that city streets and sidewalks "have immemorially been held in trust for use of the public." *Hague* v. *CIO*, 307 U. S. 496, 515 (1939). This means *all* of the public, and does not create a First Amendment right in newspaper publishers to "cordon" off a portion of the sidewalk in an effort to increase the circulation of their papers. Cf. *Schneider, supra,* at 160. As this Court wrote long ago, in upholding an ordinance that restricted a telegraph company's placement of telegraph poles on city property:

> "The ordinary traveler, whether on foot or in a vehicle, passes to and fro along the streets, and his use and occupation thereof are temporary and shifting. . . . This use is common to all members of the public, and it is a use open equally to [all] citizens . . . . But the use made by

---

ing "bolting" of newsracks to city sidewalks). Here, the District Court found that the "placement of a newspaper dispensing device on property is normally of a permanent nature, the device generally occupying a specific portion of property for months or years." App. to Juris. Statement A30–A31.

There is little doubt that if a State were to place an object of the size, weight, and permanence of a newsrack on private property, this "physical occupation" would constitute a "taking" of that property. See *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419, 427–430, 434–435 (1982); *Lovett* v. *West Virginia Central Gas Co.,* 65 W. Va. 739, 742–743, 65 S. E. 196, 197–198 (1909); *Southwestern Bell Telephone Co.* v. *Webb,* 393 S. W. 2d 117, 121 (Mo. App. 1965). The character of the newsrack's intrusion on city sidewalks is not lessened by the fact that the property here is public, the occupation is by a private party, or that the purpose of the "taking" is the communication of ideas. See generally *St. Louis* v. *Western Union Telegraph Co.,* 148 U. S. 92, 98–99 (1893) (discussed in text *infra* this page and 780).

the telegraph company is, in respect to so much of the space as it occupies with its poles, permanent and exclusive. . . . Whatever benefit the public may receive in the way of transportation of messages, that space is, so far as respects its actual use for purposes of a highway and personal travel, wholly lost to the public." *St. Louis v. Western Union Telegraph Co.*, 148 U. S. 92, 98–99 (1893).

While there is a First Amendment right to publish newspapers, publishers have no right to force municipalities to turn over public property for the construction of a printing facility. There is a First Amendment right to sell books, but we would not accept an argument that a city must allow a bookseller to construct a bookshop—even a small one—on a city sidewalk. The right to leaflet does not create a right to build a booth on city streets from which leafletting can be conducted. Preventing the "taking" of public property for these purposes does not abridge First Amendment freedoms. Just as there is no First Amendment right to operate a bookstore or locate a movie theater however or wherever one chooses notwithstanding local laws to the contrary, see *Arcara v. Cloud Books, Inc.*, 478 U. S. 697 (1986); *Renton v. Playtime Theatres, Inc.*, 475 U. S. 41 (1986), the First Amendment does not create a right of newspaper publishers to take city streets to erect structures to sell their papers.

It may be that newspaper distributors can sell more papers by placing their newsracks on city sidewalks. But those seeking to distribute materials protected by the First Amendment do not have a right to appropriate public property merely because it best facilitates their efforts. "We again reject the 'notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State.'" *Regan v. Taxation with Representation of Wash.*, 461 U. S. 540, 546 (1983) (quoting *Cammarano v. United States*, 358 U. S. 498, 515 (1959) (Douglas, J., concurring)). Conse-

quently, a city need not subsidize news distribution activities by giving, selling, or leasing a portion of city property for the erection of newsracks. "The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley* v. *Florida*, 385 U. S. 39, 47 (1966). Preserving public forum space for use by the public *generally*, as opposed to the exclusive use of one individual or corporation, is obviously one such "lawfully dedicated" use. "The streets belong to the public and are primarily for the use of the public in the ordinary way." *Packard* v. *Banton*, 264 U. S. 140, 144 (1924).

To hold otherwise, and create a First Amendment right of publishers to take city property to erect newsboxes, would ignore the significant governmental interests of cities—like Lakewood—that are threatened by newsrack placements.[7] One of these interests, discussed *supra*, at 780, is keeping the streets and sidewalks free for the use of all members of the public, and not just the exclusive use of any one entity. But this is not the only concern at issue here.

The Court has consistently recognized the important interest that localities have in insuring the safety of persons using

---

[7] The conflict between cities' efforts to protect important public interests and the desire of publishers to place newsracks on city property no doubt accounts for the recent spate of litigation in the lower courts over the constitutionality of city regulation of newsracks. See, *e. g., Gannett Satellite Information Network, Inc.* v. *Metropolitan Transportation Authority*, 745 F. 2d 767 (CA2 1984); *Miami Herald Publishing Co.* v. *Hallandale*, 734 F. 2d 666 (CA11 1984); *Providence Journal Co.* v. *City of Newport*, 665 F. Supp. 107 (RI 1987); *Gannett Satellite Information Network, Inc.* v. *Norwood*, 579 F. Supp. 108 (Mass. 1984); *City of New York* v. *American School Publications, Inc.*, 69 N. Y. 2d 576, 509 N. E. 2d 311 (1987); *Burlington* v. *New York Times Co.*, 148 Vt. 275, 532 A. 2d 562 (1987); *News Printing Co.* v. *Totowa*, 211 N. J. Super. 121, 511 A. 2d 139 (1986). See also Ball, Extra! Extra! Read All About It: First Amendment Problems in the Regulation of Coin-Operated Newspaper Vending Machines, 19 Colum. J. L. & Soc. Probs. 183, 185–187 (1985).

city streets and public forums.   See *Heffron* v. *International Society for Krishna Consciousness, Inc.*, 452 U. S. 640, 650 (1981); *Grayned* v. *City of Rockford*, 408 U. S. 104, 115 (1972); *Cox* v. *New Hampshire*, 312 U. S., at 574.   In this case, testimony at trial detailed a variety of potential safety risks posed by newsboxes, running the gamut from the obvious to the unimaginable.[8]   Based on such testimony, the District Court found that newsracks "along the streets, . . . increas[e] the probability for accidents and injury."   App. to Juris. Statement A32.   This finding was not disturbed by the Court of Appeals, even as it reversed the District Court's constitutional ruling.

A third concern is the protection of cities' recognized esthetic interests.   Lakewood and countless other American cities have invested substantial sums of money to renovate their urban centers and commercial districts.   Increasingly,

---

[8] A city official testifying at trial reported numerous incidents where objects located in the sidewalk areas where appellee wishes to erect its newsboxes—signposts, signal poles, and utility poles—were hit by cars, bicycles, or pedestrians.   App. 144–145.   A vehicle may strike a newsrack on a city sidewalk, injuring its occupants or passersby.   Cf. *Tua* v. *Brentwood Motor Coach Co.*, 371 Pa. 570, 92 A. 2d 209 (1952).   Cars may stop so that their drivers can purchase papers from newsracks, increasing the traffic hazards of city driving.   App. 89, 124–128.

Other testimony at trial and exhibits introduced there described newsracks restricting pedestrian traffic, blocking ramps for the handicapped, or being too near fire hydrants.   *Id.*, at 151–154; Defendant's Exs. GG–1, GG–7, GG–9, App. 391–393.   Even a one-on-one encounter with a seemingly benign newsrack has its risks.   Cf. *McDermott* v. *Engstrom*, 81 So. 2d 553 (Fla. 1955).   Indeed, appellee's newspaper reported recently that a man had received a serious electrical shock when he approached a newsrack, apparently resulting from the fact that the bolts used to anchor the newsrack to the ground had penetrated an electrical power line.   See Are These Streets for Walking?, The Plain Dealer, July 3, 1987, p. 12-A, cols. 1–2; see also N. Y. Times, Nov. 14, 1986, p. A14, col. 5; Editor & Publisher, Apr. 16, 1983, p. 13, cols. 1–2.

they find newsracks to be discordant with the surrounding area.[9]   A majority of this Court found that similar esthetic considerations would be sufficient to justify a content-neutral ban on all outdoor advertising signs, notwithstanding the extent to which such signs convey First Amendment protected messages.   See *Metromedia, Inc.* v. *San Diego*, 453 U. S. 490, 507–508 (1981) (plurality opinion); *id.*, at 552–553 (STEVENS, J., dissenting in part); *id.*, at 559–561 (Burger, C. J., dissenting); *id.*, at 570 (REHNQUIST, J., dissenting).   This reasoning applies to newsracks as well as billboards.   "[T]he city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect."   *Young* v. *American Mini Theatres, Inc.*, 427 U. S. 50, 71 (1976) (opinion of Stevens, J.).   See also *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 806–807 (1984); *Kovacs* v. *Cooper*, 336 U. S. 77 (1949).

We should be especially hesitant to recognize the right appellee claims where, as is the case here, there are "ample alternative channels" available for distributing newspapers. See *Arcara*, 478 U. S., at 705–706, n. 2; *Perry Education Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 53 (1983); *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 771 (1976).   The District Court found that no person in Lakewood lives more than one-quarter mile from a 24-hour newspaper outlet: either a store open all night or a newsbox located on private property.

---

[9] One article introduced at trial in this case discussed growing frustration among local officials with rapidly escalating numbers of newsracks on city streets.   See Longhini, Coping with High-Tech Headaches, 50 Planning Contents 31–32 (Mar. 1984).   Esthetic problems are among the chief complaints.   See *id.*, at 31.

Many other accounts have quoted city officials and city residents expressing dismay over newspaper distributors' seeming disregard for local esthetic concerns and standards.   See, *e. g.*, Editor & Publisher, Sept. 8, 1984, p. 11, cols. 1–3; N. Y. Times, Aug. 22, 1984, p. A12, cols. 3–5; Editor & Publisher, May 28, 1983, p. 43, col. 1.

App. to Juris. Statement A27. Home delivery, the means by which appellee distributes the vast majority of its newspapers, *id.*, at A26, is an option as well. The First Amendment does not require Lakewood to make its property available to the Plain Dealer so that it may undertake the most effective possible means of selling newspapers. See *Heffron* v. *International Society for Krishna Consciousness, Inc.*, *supra*, at 647.

In sum, I believe that the First Amendment does not create a right of newspaper publishers to take a portion of city property to erect a structure to distribute their papers. There is no constitutional right to place newsracks on city sidewalks over the objections of the city.

### C

Because there is no such constitutional right, the predicate for applying the *Freedman* v. *Maryland* line of cases, see *supra*, at 776–777, is not present in this case. Because the Lakewood ordinance does not directly regulate an activity protected by the First Amendment, we should instead take the traditional, as-applied approach to adjudication exemplified by the *Lieberman* line of cases. Appellee's facial challenge to the mayor's discretion under § 901.181(c)(7) should therefore be rejected.

The Court offers three reasons for departing from this time-tested approach for applying the *Lovell-Freedman* doctrine, and for substituting its new "nexus to expression" test. I consider these three reasons in turn.

### (1)

First, the majority seeks support for its rejection of the foregoing analysis by comparing two previous decisions: *Saia* v. *New York*, 334 U. S. 558 (1948), and *Kovacs* v. *Cooper*, *supra*. *Saia* struck down a local ordinance vesting absolute discretion in a local official over permits for the use of sound-amplification trucks; *Kovacs* upheld a local law which totally

banned the use of such trucks. Today's majority states that in *Kovacs*, *Saia* was distinguished on grounds that support its position here. *Ante*, at 764–766.

The majority's reading of these two cases is flawed for several reasons. First, the "rationale of *Kovacs*" on which the majority relies was not the Court's view at all, but rather, an opinion for a three-Justice plurality. See *Kovacs*, *supra*, at 78–89 (opinion of Reed, J.). In fact, four other Justices in *Kovacs* understood the Court's action in that case in the exact contrary manner—*i. e.*, as being a repudiation of the earlier decision in *Saia*. See *Kovacs*, 336 U. S., at 97–98 (Jackson, J., concurring); *id.*, at 101–102 (Black, Douglas, and Rutledge, JJ., dissenting). Thus, the majority's explanation of how a comparison of *Kovacs* and *Saia* support its conclusion rests on a view of those two cases that was rejected by more Justices than accepted it at the time that *Kovacs* was decided.

An equally plausible reading of *Saia* is the one that a plurality of Justices took when revisiting the sound-truck question in *Kovacs: Saia* rested on the "assumption"—later proved erroneous in *Kovacs*—that a municipality could not ban sound trucks altogether. *Saia* repeatedly suggests that a "ban" on sound trucks would not pass constitutional muster. See 334 U. S., at 562. Cf. also *id.*, at 559–560, 561. And the Court in *Saia* indicated that it was moved by its view that sound trucks were "indispensable instruments of effective public speech." *Id*, at 561.

Since *Saia*'s underlying premise was called into question in *Kovacs*, 336 U. S., at 97–98 (Jackson, J., concurring); *id.*, at 101–102 (Black, J., dissenting), at the very least, the majority's *Saia-Kovacs* comparison is a shaky foundation for the departure from prior precedent which the Court now undertakes.

(2)

Second, the Court incorrectly suggests that I rely on the now-discredited "greater-includes-the-lesser" formulation of Justice Holmes, as adopted by this Court in *Davis* v. *Massa-*

*chusetts*, 167 U. S. 43 (1897). *Ante*, at 762–766. The majority then engages in a detailed analysis of cases having no applicability here whatsoever, *ante*, at 766–767, to slay this straw man of its own creation.

As defined at its inception, "greater-includes-the-lesser" reasoning holds that where a State or municipality may ban an activity altogether, it is consequently free "to determine under what circumstances such [activity] may be availed of, as the greater power contains the lesser." See *Davis, supra*, at 48. But if, for example, a Lakewood ordinance provided for the issuance of newsrack licenses to only those newspapers owned by persons of a particular race, or only to members of a select political party, such a law would be clearly violative of the First Amendment (or some other provision of the Constitution), and would be facially invalid. And if the mayor of Lakewood granted or refused license applications for similar improper reasons, his exercise of the power provided him under § 901.181(c)(7) would be susceptible to constitutional attack. Thus, I do not embrace the "greater-includes-the-lesser" syllogism—one that this Court abandoned long ago. Cf. *Hague* v. *CIO*, 307 U. S., at 515.

Instead, my view is simply this: where an activity that could be forbidden altogether (without running afoul of the First Amendment) is subjected to a local license requirement, the mere presence of administrative discretion in the licensing scheme will not render it invalid *per se*. In such a case—which does not involve the exercise of First Amendment protected freedoms—the *Lovell-Freedman* doctrine does not apply, and our usual rules concerning the permissibility of discretionary local licensing laws (and facial challenges to those laws) must prevail.

(3)

Finally, the Court asserts that I do not understand the nature of the conduct at issue here. *Ante*, at 768. It is asserted that "[t]he actual 'activity' at issue here is the cir-

culation of newspapers, which is constitutionally protected."
*Ibid.* But of course, this is wrong. Lakewood does not, by
its ordinance, seek to license the circulation of newspapers
within the city. In fact, the Lakewood ordinance does not
even require licenses of all newsracks within the jurisdic-
tion—the many newsracks located within Lakewood on pri-
vate property are *not* included within the scope of the city's
ordinance. See App. 373–374. Thus, it is the majority—
and not I—that is guilty of "recharacterizing" the activity
that Lakewood licenses. The Lakewood ordinance must be
considered for what it is: a license requirement for newsracks
on city property.

This is why, notwithstanding the Court's intimations to the
contrary, *ante,* at 766–769, my approach would not change
the outcome of our previous cases in this area. In those cases
the local law at issue required licenses —not for a narrow cat-
egory of expressive conduct that could be prohibited—but for
a sweeping range of First Amendment protected activity.
Thus, the law at issue in *Shuttlesworth* v. *Birmingham,* 394
U. S., at 149, required a license for "any parade"; the license
scheme under attack in *Freedman* v. *Maryland,* 380 U. S.,
at 52–53, and n. 1, applied to all films shown in the State
of Maryland; the law at issue in *Lovell* v. *Griffin,* 303 U. S.,
at 451, applied to any distribution of leaflets or pamphlets
within the city limits. Surely, even at the extreme level
of abstraction at which the Court operates in its opinion, the
majority can recognize a difference between the scope and
dangers of these laws, and Lakewood's more focused regula-
tion. See also n. 13, *infra.*

## III

I now address the rule of decision the majority offers.

## A

Instead of the relatively clear rule that the Court's prior
cases support, the majority today adopts a more amorphous
measure of when the *Lovell-Freedman* doctrine should apply.

As I see it, the Court's new "nexus to expression, or to conduct commonly associated with expression" test is peculiarly troublesome, because it is of uncertain scope and vague expanse.

The Court appears to stop short of saying that any statute that delegates discretionary administrative authority that has the *potential* to be used to suppress speech is unconstitutional. A great variety of discretionary power may be abused to limit freedom of expression; yet that does not mean that such delegations of power are facially invalid. See *Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 503–504 (1982).[10]

The new Lakewood ordinance enacted in tandem with § 901.181 illustrates this principle well. As discussed, *ante*, at 753–754, when the District Court invalidated Lakewood's complete ban on all structures on city property (then § 901.18 of the city code), the city enacted two new ordinances. One, § 901.181, provides for licensing newsracks on city property—the subject of this appeal. The second, § 901.18, gives the City Council *unlimited* discretion to grant or deny applications for all other exclusive uses of city property. App. 266–267. Someone who wishes to apply for permission under § 901.18 to erect a soft-drink vending machine on city property may fear that his application will be denied because

---

[10] For example, the power to hire and fire public employees can be abused to suppress discussion on matters of public concern, see, *e. g.*, *Rankin* v. *McPherson*, 483 U. S. 378 (1987), but that does not render facially invalid all laws that give public employers discretion to hire and fire. The plenary power given state public utility commissions to regulate local utilities too can be misused to infringe on protected speech rights, see *Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of Cal.*, 475 U. S. 1, 10–15 (1986); *Consolidated Edison Co. of N. Y.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 533–535 (1980), but that does not render the statutes granting such regulatory power facially infirm. Even the power to grant or deny liquor licenses can be abused in violation of the First Amendment, cf. *Reed* v. *Village of Shorewood*, 704 F. 2d 943, 949–951 (CA7 1983), but this does not *per se* invalidate all local liquor laws.

he has engaged in some First Amendment protected activities which are not to the City Council's liking. These fears may even be substantial, and they may be based on facts eminently provable in a courtroom; *e. g.*, that the applicant opposed a City Councilwoman in her last election campaign. Yet surely § 901.18 is not invalid on its face merely because it creates the *possibility* that the discretion accorded therein to the City Council could be abused in the way that the soft-drink vending machine applicant fears. Cf. *Grayned* v. *City of Rockford*, 408 U. S., at 121, n. 50; *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 395–396 (1926).

Seeking a way to limit its own expansive ruling, the Court provides two concrete examples of instances in which its newly crafted "nexus to expression" rule will *not* strike down local ordinances that permit discretionary licensing decisions. First, we are told that a law granting unbridled discretion to a mayor to grant licenses for soda machine placements passes constitutional muster because it does not give that official "frequent opportunities to exercise substantial power over the content or viewpoint of the vendor's speech." *Ante*, at 761. How the Court makes this empirical assessment, I do not know. It seems to me that the nature of a vendor's product—be it newspapers or soda pop—is not the measure of how potent a license law can be in the hands of local officials seeking to control or alter the vendor's speech. Of course, the newspaper vendor's speech is likely to be more public, more significant, and more widely known than the soda vendor's speech—and therefore more likely to incur the wrath of public officials. *But* in terms of the "usefulness" of the license power to exert control over a licensee's speech, there is no difference whatsoever between the situation of the soda vendor and the newspaper vendor.[11]

---

[11] Indeed, in practical terms, if two businesses contemplated the prospect of standing before Lakewood's officials to seek vending machine permits — a sole proprietorship seeking a license for a soda machine that is the only source of the owner's income, and the Plain Dealer Publishing Co. seeking

If the Court's treatment of the soda machine problem is not curious enough, it also "assures" us that its ruling does not invalidate local laws requiring, for example, building permits—even as they apply to the construction of newspaper printing facilities. These laws, we are told, provide "too blunt a censorship instrument to warrant judicial intervention." *Ante*, at 761. Thus, local "laws of general application that are not aimed at conduct commonly associated with expression" appear to survive the Court's decision today. *Ante*, at 760–761.

But what if Lakewood, following this decision, repeals local ordinance § 901.181 (the detailed newsrack permit law) and simply left § 901.18 (the general ordinance concerning "any . . . structure or device" on city property) on the books? That section vests absolute discretion (without any of the guidelines found in § 901.181) in the City Council to give or withhold permission for the erection of devices on city streets. Because this law is of "general application," it should survive scrutiny under the Court's opinion—even as applied to newsracks. If so, the Court's opinion takes on an odd "the-greater-but-not-the-lesser" quality: the more activities that are subjected to a discretionary licensing law, the more likely that law is to pass constitutional muster.

## B

As noted above, our tradition has been to discourage facial challenges, and rather, to entertain constitutional attacks on local laws only as they are applied to the litigants. The facts of this case indicate why that policy is a prudent one.

Most importantly, there could be no allegation in this case that the mayor's discretion to deny permits *actually* has been abused to the detriment of the newspaper, for the Plain

---

licenses for newsracks—I have little doubt about which applicant would be more likely to feel constrained to alter its expressive conduct in anticipation of the encounter.

Dealer has not applied for a permit for its newsracks under §901.181. App. to Juris. Statement A30. Indeed, the District Court found that the "Mayor stands ready and willing to permit coin-operated newspaper dispensing devices in the commercial areas of the City" pursuant to the ordinance. *Ibid.* It also found that the "only reason why the [appellee] has not placed newspaper dispensing devices along the streets of Lakewood where permitted, is that the [appellee] has not applied for such use." *Id.*, at A32.

Indicative of the true nature of this litigation is the fact that the city of Lakewood has had on the books, since January 1987, an interim ordinance that licenses the placement of newsracks on city property—an ordinance that is free of the constitutional defects challenged here. Eighteen months have passed since the interim ordinance was enacted, and the Plain Dealer apparently still has not applied for a license to place its newsracks on city property.[12] Thus, the Court, with a strange rhetorical flourish, belittles the usefulness of judicial review as a tool to control the mayor's discretion in granting newsrack licenses, because newspaper publishers and their reading public cannot afford to await the results of the judicial process. *Ante*, at 771. "[N]ewspaper publish-

---

[12] The discussion of the interim ordinance at oral argument highlights this point:

"QUESTION: Well, then, while [the interim] ordinance is in effect, have you gone ahead and installed some boxes?

"MR. GARNER [Appellees' Counsel]: No, we have not, Your Honor.

"QUESTION: Why not?

. . . .

"MR. GARNER: We thought, as I suggested earlier, we think this is a very important case, and from the Plain Dealer's immediate standpoint certainly—

"QUESTION: In other words, you'd rather win the lawsuit then get the boxes out there.

"MR. GARNER: Yes, that's correct, Your Honor. . . ." Tr. of Oral Arg. 43–44.

See also n. 13, *infra* (comparing this case to *Freedman* v. *Maryland*, 380 U. S. 51 (1965), and *Shuttlesworth* v. *Birmingham*, 394 U. S. 147 (1969)).

ers can[not] wait indefinitely for a permit" and "a paper needs public access at a particular time," we are remonstrated. *Ante*, at 771–772. Yet the Plain Dealer has eschewed the availability of a wholly constitutional permit for its newsracks for a year and a half.

The Court mentions the risk of censorship, the everpresent danger of self-censorship, and the power of prior restraint to justify the result. See, *e. g., ante*, at 757–759, 767–768. Yet these fears and concerns have little to do with this case, which involves the efforts of Ohio's largest newspaper to place a handful of newsboxes in a few locations in a small suburban community. Even if one accepts the testimony of appellee's own expert, it seems unlikely that the newsboxes at issue here would increase the Plain Dealer's circulation within Lakewood by more than a percent or two; the paper's overall circulation would be affected only by about one one-hundredth of one percent (0.01%). See App. 82–84, 214.

It is hard to see how the Court's concerns have any applicability here. And it is harder still to see how the Court's image of the unbridled local censor, seeking to control and direct the content of speech, fits this case. In the case before us, the city of Lakewood declined to appeal an adverse ruling against its ban on newsracks, and instead amended its local laws to permit appellee to place its newsboxes on city property. See *id.*, at 270–274. When the nature of this ordinance was not to the Plain Dealer's liking, Lakewood again amended its local laws to meet the newspaper's concerns. See *id.*, at 275. Finally, when the newspaper, still disgruntled, won a judgment against Lakewood from the Court of Appeals, the city once again amended its ordinance to address the constitutional issues. See App. to Brief for Appellee A56–A59. The Court's David and Goliath imagery concerning the balance of power between the regulated and

the regulator in this case is wholly inapt—except, possibly, in reverse.[13]

## IV

Because, unlike the Court, I find that the Lakewood ordinance is not invalid by virtue of the discretion it vests in the city's mayor, I must reach the question whether the law is invalid for the other reasons the Court of Appeals cited. I conclude that it is not.

## A

A similar analysis to the one I suggest in Parts II and III, *supra*, applies to Lakewood ordinance § 901.181(a), concerning the Architectural Review Board. Appellee argues

---

[13] It should be noted that several aspects of the particular ordinance at issue here diminish the possibility that it will result in the general abuses that the majority fears. These factors also distinguish the Lakewood ordinance from the local licensing laws under consideration in the cases that the Court relies on it its opinion.

First, unlike many regulatory schemes we have struck down in the past, cf., *e. g.*, *Shuttlesworth* v. *Birmingham, supra*, at 149–150, 153, 157–158, § 901.181 requires that the mayor state the reasons for any denial of a newsrack permit application. This statement of reasons should facilitate review of the mayor's decision, and help to insure that it does not rest on an unconstitutional rationale.

Second, the availability of such review of mayoral decisions is another distinguishing aspect of the ordinance. Cf., *e. g.*, *Staub* v. *City of Baxley*, 355 U. S., at 325. Section 901.181(e), allows (in the first instance) appeal to the City Council of any unfavorable mayoral decision. Then, if this appeal is unsuccessful, a dissatisfied applicant can seek relief from the Ohio courts under state law. Ohio Rev. Code Ann. § 2506.01 *et seq.* (Supp. 1987). These appeals provide assurance that any abuse of the mayor's discretion under the ordinance is unlikely to go unremedied.

Finally, the Court ignores the fact that the license that appellee seeks is not for conducting an activity (such as showing films or organizing a parade) for which a "most propitious opportunity for exhibition [may] pas[s]," *Freedman, supra*, at 61, but rather, for the erection of a semi-permanent structure on city property. Thus, the administrative and judicial appeals processes made available by city and state laws can serve as a more effective check on the mayor's decisionmaking, with less of a burden on the permit-applicant, than was the case in *Freedman* or *Shuttlesworth*.

that this ordinance provision, like the one giving discretion to the mayor to grant or deny permit applications, vests excessive and unbridled discretion in the Board, and thereby is violative of the First Amendment. But for the reasons that I concluded, *supra*, at 784, that § 901.181 does not directly regulate activity protected by the First Amendment, I think this facial challenge to the Architectural Review Board's role under the ordinance must fail as the challenge to § 901.181(c)(7) did. Section 901.181(a) does not fall simply because the Board *may* find a way to use its discretion to suppress speech.

The fallacy of the Plain Dealer's argument to the contrary is exposed by considering its full implications. Under Lakewood Codified Ordinance § 1325.04, the Architectural Review Board has discretion to approve or reject designs for *"all* new construction . . . within the City."  See App. 386 (emphasis added). If we were to accept the Plain Dealer's analysis that any potentially speech-suppressing discretion renders a local law facially invalid, we would have to strike § 1325.04 as well: after all, the Board could use its discretion under that ordinance to punish or chill the speech of any person in the city seeking to construct a new building.[14] Yet this mere possibility is not sufficient to invalidate § 1325.04. Likewise, the potential for abuse under § 901.181(a)—which simply subjects newsracks to the same architectural review applied to all other structures erected in Lakewood—is not sufficient to invalidate that provision either.

The First Amendment does not grant immunity to the Plain Dealer from the city's general laws regulating businesses that operate therein. "The publisher of a newspaper

---

[14] Not only would Lakewood's ordinance fall to such a challenge, but so too would countless other local laws that grant Architectural Review Boards substantial discretion to approve the construction plans of applicants who may fear reprisal for the exercise of their First Amendment rights, or who wish to construct some structure in which First Amendment protected activities will take place.  See App. B to Brief for National Institute of Municipal Law Officers as *Amicus Curiae.*

has no special immunity from the application of general laws." *Associated Press* v. *NLRB*, 301 U. S., at 132; see also, *e. g., Citizen Publishing Co.* v. *United States*, 394 U. S. 131, 139 (1969); *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 192–193 (1946). The District Court found that Lakewood has applied its architectural review process to *all* new construction in the city. App. to Juris. Statement A36. According to the city, bookstores, theaters, and churches under construction or renovation have all been required to obtain board approval for their construction. See Brief for Appellant 37–38. To hold that all structure where First Amendment protected activities take place are somehow exempt from this normal local regulation would be anomalous and contrary to our precedents. See *Young* v. *American Mini Theatres, Inc.*, 427 U. S., at 62.

The Court of Appeals, 794 F. 2d 1139, 1146 (CA6 1986), thought it significant that the Board had no specific standards applying to newsrack designs, but rather, had only general architectural standards applicable to "buildings." Of course, this basis for disapproval is particularly ironic, since the "narro[w] and specifi[c]" focus of § 901.181 on the placement of newsracks is one reason why this Court finds that law to be suspect. *Ante*, at 760. Consequently, with respect to a future ordinance free from the defect the Court finds fault with today, the city of Lakewood finds itself between a rock and a hard place: make the rules newsrack-specific, and be accused of drawing the noose too tightly around First Amendment protected activities; apply more general rules to newsracks, and be told that your regulators lack standards sufficiently specific to pass constitutional muster.

The conundrum is unfortunate. Simply because a newspaper may find new ways to distribute its papers, via semi-permanent structures that are not "buildings," should not permit the publisher to escape otherwise all-inclusive city regulation. Section 901.181(a) simply takes the rule that applies generally to all new structures in Lakewood and extends it to cover the structures at issue here: newsracks.

Newsracks have no First Amendment right to be placed on city streets with disregard for these important economic and esthetic concerns, or to contribute to the "visual blight" cities are working so hard to eradicate. See *Vincent*, 466 U. S., at 810.

Finally, the Court's opinion provides substantial support for the view that Lakewood's Architectural Review Board requirement *is* constitutional. As I noted, *supra*, at 790, the Court today holds that laws of general application are not invalid due to excessive discretion, even when they are applied to expressive activities. *Ante*, at 760–761. Since the architectural review requirement is such a law of general application, it appears to me that the Court's opinion implicitly sustains the constitutionality of the imposition of this requirement on appellee's newsboxes. Moreover, since this portion of the Lakewood ordinance only requires the approval of the Architectural Review Board on a single occasion, at the time of the initial adoption of a particular newsbox design, I think it is clearly encompassed within the Court's discussion of permissible building permit laws. *Ibid.*

## B

The final disputed provision of the Lakewood ordinance, § 901.181(c)(5), requires that newsrack owners indemnify the city for "any and all liability . . . occasioned upon the installation and use" of any newsrack. It also requires newsrack permittees to obtain liability insurance in the amount of $100,000 to cover any such liability.

The city's reasons for imposing such requirements are obvious. Under Ohio law, a municipality has no sovereign immunity, and "is liable for its negligence in the performance or nonperformance of its acts." *Haverlack* v. *Portage Homes, Inc.*, 2 Ohio St. 3d 26, 30, 442 N. E. 2d 749, 752 (1982); cf. *Dickerhoof* v. *Canton*, 6 Ohio St. 3d 128, 451 N. E. 2d 1193 (1983). While there is some dispute between the parties as to how substantial is the city's risk of being held liable for an injury caused by a newsbox located on city property, there

remains sufficient risk to suggest that avoiding such liability is a legitimate concern of Lakewood's City Council.

In fact, appellee acknowledges that, standing alone, the city's indemnification and insurance requirements would be constitutional; the Plain Dealer recognizes that there is no constitutional bar to requiring newspaper distributors to meet such requirements.[15] Nor does it argue that such insurance policies are unobtainable, or make the use of newsboxes economically infeasible.[16] Rather, appellee argues (and the Court of Appeals found), that this provision is invalid because it applies to newsracks and not other "users" of the public streets. 794 F. 2d, at 1147.

This Court has consistently held that "differential treatment . . . [for] the press . . . is presumptively unconstitutional." See *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 585 (1983). Yet, in this case, I find this argument inapposite and unpersuasive. First, it ignores the obvious difference between those on-street objects that are essential to the public safety and welfare—such as bus shelters, telephone and electric wiring poles, and emergency phone boxes—and the preferred distribution means of a private newspaper company, the Plain Dealer's newsboxes. Judge Unthank, in concurrence below, recognized the difference between these "public services of a quasi-governmental nature," and appellee's newsracks. 794

---

[15] The following excerpt from oral argument makes this point clear:

"QUESTION: [Y]ou assert that it is not possible under the First Amendment for the city to require indemnity insurance for those devices? I think that is a remarkable proposition.

"MR. GARNER [Appellee's Counsel]: No, I am not suggesting that, Your Honor. No. No, I am not suggesting that. . . . " Tr. of Oral Arg. 48.

[16] Nor could the Plain Dealer so argue. Lakewood introduced as exhibits at trial copies of $1 million liability insurance policies (10 times the amount required by ordinance § 901.181(c)(5)) that the Plain Dealer obtained for the benefit of 11 other cities in Ohio—including the city of Cleveland—where it has located newsracks on public property. App. 401.

F. 2d, at 1148. I also find the difference to be a significant one.[17]

Until this litigation ensued, a Lakewood ordinance banned the construction of any new structure on city property. The new ordinances adopted in response to the initial District Court decision below, which allow such structures, do explicitly require insurance from newsrack-permittee holders, while being silent on this question with respect to other potential permittees on public land. Compare § 901.181(c)(5) with § 901.18. But there is nothing in the record to suggest that the city would not require such insurance of any applicant under § 901.18. Cf. *Gannett Satellite Information Network, Inc.* v. *Metropolitan Transportation Authority*, 745 F. 2d 767, 773–774 (CA2 1984); see also *ante*, at 755, n. 3. If the city does begin to treat nonpress permittees more favorably than newsrack permittees, the Plain Dealer may have a valid constitutional challenge to § 901.181(c)(5) at that time. But I am unwilling to imply that such will be the city's practice based on the record before us. See *Renton* v. *Playtime Theatres, Inc.*, 475 U. S., at 53. Consequently, I would reject appellee's facial challenge to § 901.181(c)(5).

---

[17] In addition, it may be beyond Lakewood's control to impose indemnity and insurance requirements on those entities that have structures on public property that predate the city's recent legislation. According to appellant, many of these placements of utility poles, signal boxes, and the like are on property obtained by utilities from the city via easement grants several decades old. See Tr. of Oral Arg. 28.

The city contended at argument (without dispute from the Plain Dealer) that it is Lakewood's policy to place indemnification and insurance requirements in all city rental contracts at this time. See *ibid.* Henceforth, then, the pre-existing nonindemnifying structures on city property will become the "isolated exceptions and not the rule." See *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 583, n. 5 (1983); cf. *Oklahoma Press Publishing Co.* v. *Walling*, 327 U. S. 186, 193–194 (1946). Any future discriminatory application of what the city claims to be its current, uniform policy would, of course, be unconstitutional. See *Minneapolis Star*, *supra*, at 583–584.

## V

For the foregoing reasons, I dissent from the Court's opinion and its judgment in this case. I would reverse the Court of Appeals' decision invalidating the Lakewood ordinance.