The **INDEPENDENT COIN PAYPHONE ASSOCIATION, INC.**, an Illinois non-profit corporation, and **Public Telephone Corporation**, an Indiana corporation, Plaintiffs,

v.

The **CITY OF CHICAGO**, a municipal corporation of the State of Illinois, **Graham Grady**, Zoning Administrator of the City of Chicago, and **Judith C. Rice**, Director of the City of Chicago Department of Revenue, in their official capacities and not individually, Defendants.

No. 93 C 7290.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 12, 1994.

Michael Walter Ward, Henry T. Kelly, John F. Ward, Jr., Patrick L. Moore, O'Keefe, Ashenden, Lyons & Ward, Chicago, IL, James E. Beckley, James E. Beckley & Associates, Wheaton, IL, for Independent Coin Payphone Ass'n and Public Telephone Corp.

Susan S. Sher, Susan Herdina, Susan R. Lichtenstein, William A. Chamberlain, Andrew S. Mine, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, for City of Chicago, Graham C. Grady and Judith C. Rice.

### MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs The Independent Coin Payphone Association ("Independent Coin") and Public Telephone Corporation ("PTC")[1] have brought suit against the City of Chicago, Graham C. Grady ("Grady"), Chicago's Zoning Administrator[2], and Judith C. Rice ("Rice"), Chicago's Director of Revenue (collectively, "the City"), arguing that two ordinances enacted by the City violate the United States and Illinois Constitutions in a variety of ways. Presently before us are plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss the Verified Complaint. For the following reasons, we deny the motion for a preliminary injunction,

1. Plaintiffs are all telecommunications carriers pursuant to Section 13–202 of the Illinois Public Utilities Act, 220 ILCS 5/13–202. Cmplt. at ¶¶ 5 & 13.

2. Although Grady is no longer Chicago Zoning Administrator, Grady's successor has not been substituted as a party in this lawsuit. For purposes of this opinion, we will refer to Grady as if he were still the Chicago Zoning Administrator. Since Grady, sued in his official capacity, is being dismissed (see f.n. 16, *infra*), we are not ordering that his successor be substituted as a party defendant.

and grant in part and deny in part the motion to dismiss.[3]

## I. Factual Background

On July 7, 1992, Chicago's city council enacted the two provisions at issue here. The first amended the Chicago Zoning Ordinance, while the second amended the Chicago Franchise Ordinance. *See* Municipal Code of Chicago, Title 17–44–220(12) (the "Zoning Ordinance"); Municipal Code of Chicago, Title 10–28–265 (the "Franchise Ordinance"). Together, these amendments effectively authorize city officials to prohibit and/or remove public payphones within city limits. The stated purpose behind the two ordinances, as plaintiff concedes, is to discourage criminal conduct—particularly drug trafficking and gang activity—centering around public payphones.

The Zoning Ordinance prohibits the placement of outdoor public payphones on private property unless the payphone provider obtains an exception. The relevant provision states:

Exceptions from the requirements of this title may be granted by the Zoning Administrator only in the following instances and in no others: ...

(12) To permit the installation of an outdoor public telephone, including any telephone booth, on any property or attached to the outside of any building or structure provided that the placement and location of the telephone will not be detrimental to the public welfare nor injurious to other property or improvements in the neighborhood in which it is located.... Such exceptions shall be subject to cancellation when, in the opinion of the Zoning Administrator, the public telephone is detrimental to the public welfare or injurious to other property or improvements in the neighborhood in which it is located.

Municipal Code of Chicago, Title 17–44–220(12). In addition, the Zoning Ordinance requires all pre-existing outdoor public payphones to obtain an exception.

While appeals from the Zoning Administrator's decisions are not expressly addressed under this provision, the Municipal Code of Chicago permits parties to appeal decisions of the Zoning Administrator to the Board of Zoning Appeals, which has an unlimited amount of time within which to render a decision.[4] Municipal Code of Chicago, Title 17–44–060 and 070.

Finally, the Zoning Ordinance requires the Zoning Administrator to notify the alderman of the ward in which such an exception is sought ten days prior to making a decision regarding the exception. According to plaintiffs, the alderman lets Grady, the Zoning Administrator, know whether he does or does not approve the application and, on the strength of the alderman's recommendation, Grady grants or denies the requested exception. Cmplt. at ¶ 32.

The Franchise Ordinance prohibits the placement of public payphones on the public way unless the phone provider enters into a franchise agreement with the city. The ordinance provides as follows:

(b) Such [franchise] contracts and the method of awarding such contracts shall, to the greatest extent possible, be designed to:

(1) Discourage illegal drug sales and other criminal activity that are sometimes associated with and facilitated by pay telephones in the public way;

(2) Reduce the disturbances that pay telephones may tend to promote in residential areas;

(3) Reduce visual clutter in the public way;

(4) Reduce the unnecessary obstruction of pedestrian and vehicular traffic;

(5) Ensure the availability of pay telephones where they are needed for lawful purposes;

---

3. Plaintiffs have also moved to strike portions of the City's affidavits submitted in response to the motion for preliminary injunction. Because we did not consider the contested affidavits in ruling on either the motion to dismiss or the preliminary injunction, we deny plaintiffs' motion to strike as moot.

4. Plaintiffs allege that none of the appeals they have filed have been decided, although 241 such appeals are currently pending before the Zoning Board of Appeals. Cmplt. at ¶ 33. .

(6) Provide adequate access to pay telephones by disabled persons; and

(7) Generate revenue for the city.

Municipal Code of Chicago, Title 10–28–265(b). The ordinance goes on to require that "[a]ny contract entered into pursuant to this section shall provide that the privileges granted by the contract are subject to the city council's authority to order the removal of a pay telephone pursuant to subsection (f)" of the ordinance. Subsection (f), in turn, states that:

[t]he city council may at any time after January 1, 1993 or at any time after the effective date of this section if pursuant to a contract under this section, by ordinance order the removal of a particular pay telephone that is in the public way.

*Id.*

Plaintiffs charge that, in an effort to generate revenue, the City and Grady have denied zoning exceptions for public payphones on private property, but have permitted franchisees to operate outdoor public payphones at adjacent and/or identical locations. Additionally, plaintiffs assert that phones for which they have received exceptions, or which are on appeal before the Zoning Board of Appeals, have been removed, while nonconforming phones at the same locations (belonging to providers who have entered into franchise agreements with the City) have remained untouched.[5] Cmplt. at ¶¶ 46 & 47. Finally, plaintiffs allege that the City's reasons for denying them permits to install payphones on private property—namely, to prevent gang and drug activity or to avoid visual clutter and disturbances—are merely pretext for the more nefarious ends of garnering revenue. In fact, as evidence that the new ordinances are superfluous, plaintiffs cite to existing legislation prohibiting unnecessary

noise (Ord. No. 10–8–070), disorderly conduct (Ord. No. 8–4–010), and "gang-related congregations" (Ord. No. 8–4–015), not to mention the numerous state and federal statutes directed at drug trafficking.

## II. Discussion

### A. Motion to Dismiss

Plaintiffs' complaint contains six counts ranging from claims that defendants have violated the First Amendment's guarantee of free speech to allegations that defendants have engaged in illegal taxation in violation of the Illinois Constitution. Defendants have moved to dismiss each of these counts. Before addressing plaintiffs' motion for preliminary injunction, we will determine whether the various counts state claims upon which relief can be granted.

### 1. Count I—First Amendment

In Count I of their complaint, plaintiffs allege that the Zoning and Franchise Ordinances violate the First Amendment's guarantee of free speech by discriminating against and unlawfully restraining public use of payphones for legitimate purposes on private and public property. The City seeks to dismiss, arguing that the First Amendment is not implicated, because public payphones are properly characterized as structures. The City also contends that, in any event, the ordinances are simply reasonable time, place, and manner limitations.

Plaintiffs raise both as-applied and facial challenges to the Zoning Ordinance, and a facial challenge to the Franchise Ordinance. The as-applied challenge, however, is clearly deficient, since plaintiffs have failed to allege that the ordinances have been used to curtail *their* First Amendment rights.[6] Accordingly, we turn to the facial challenges.

---

**5.** In all, plaintiffs describe four categories of phones that have been removed: (1) those for which zoning exceptions have been granted, (2) those with pending applications for exceptions, (3) those which have been denied exceptions and are on appeal before the Zoning Board of Appeals, and (4) those for which exceptions have been received, but which the City and Rice mistakenly believe to be on the public way. Cmplt. at ¶ 51.

**6.** Plaintiffs merely allege that the "delegation [of decisionmaking on zoning exceptions to aldermen] has a chilling effect on Plaintiffs' speech in that opposing an incumbent alderman may well result in refusals to grant exceptions or in instant terminations of such exceptions." Cmplt. at ¶ 60. Notably absent is any allegation that either the Zoning Administrator or any alderman has actually denied or revoked exceptions based on plaintiffs' speech. Moreover, because plaintiffs have not applied for franchise agreements, they

■ Regardless of whether a public payphone is a structure which can be prohibited entirely from the public way, *see Graff v. City of Chicago,* 9 F.3d 1309 (7th Cir.1993), it is evident that the City's motion to dismiss Count I of the complaint should be granted. Put another way, even if a public payphone is a structure containing speech elements, plaintiffs may not mount a facial challenge to either the Franchise or the Zoning Ordinance.

The Supreme Court has noted that facial challenges, i.e. constitutional challenges by parties that have not been harmed by the licensing scheme at issue, are appropriate when a licensing scheme vests unbridled discretion in the hands of a government official or agency.[7] *See City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–759, 108 S.Ct. 2138, 2143–45, 100 L.Ed.2d 771 (1988) ("Recognizing the explicit protection accorded speech and the press in the text of the First Amendment, our cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."). The *Lakewood* Court identified "two major First Amendment risks associated with unbridled licensing schemes: self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action." *Id.* 486 U.S. at 759, 108 S.Ct. at 2145. The Court observed that "[i]t is when statutes threaten these risks to a significant degree that courts must entertain an immediate facial attack on the law." *Id.*

■ However, not every law involving discretion is subject to facial challenge. Instead, "[t]he law must have a close enough

nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.* 486 U.S. at 759, 108 S.Ct. at 2145.

According to the complaint, the only real threat of censorship presented by the Ordinances derives from the unlimited discretion placed in the hands of City officials charged with granting, denying and revoking exceptions and franchises. This discretion, along with the manner in which it is allegedly exercised, "has a chilling effect on Plaintiffs' speech in that opposing an incumbent alderman may well result in refusals to grant exceptions or in instant terminations of such exception." Cmplt. at ¶ 60.[8]

This alleged threat of chill, however, has an insufficient nexus to expression to warrant a facial challenge. The Supreme Court made the point in *Lakewood:*

> [T]he dissent's analogy between newspapers and soda vendors is inapposite. Newspapers are in the business of expression, while soda vendors are in the business of selling soft drinks. Even if the soda vendor engages in speech, that speech is not related to the soda; therefore preventing it from installing its machines may penalize unrelated speech, but will not directly prevent that speech from occurring. In sum, a law giving the mayor unbridled discretion to decide which soda vendors may place their machines on public property does not vest him with frequent opportunities to exercise substantial power over the content or viewpoint of the vendor's speech by suppressing the speech or directly controlling the vendor's ability to speak.

*Lakewood,* 486 U.S. at 760, 108 S.Ct. at 2146. Even acknowledging that public payphone providers are in the business of providing phones, it is clear that, unlike newspapers, they are not in the business of selling, or even encouraging, particular or identifiable

---

cannot bring an as-applied challenge against the Franchise Ordinance.

7. Of course, while Independent Coin may well have been affected by the ordinances, it effectively concedes that its *First Amendment* rights are not at stake.

8. Although this paragraph purports to state an as-applied challenge, it is the only portion of the complaint that raises the censorship dangers at the heart of facial challenges. Accordingly, we consider it here.

expression. As a result, an alderman's alleged power over payphone providers is only slightly more constitutionally troubling (as far as censorship is concerned) than a mayor's control over a soda machine vendor, if at all. We therefore conclude that the censorship risks alleged here do not justify permitting a facial challenge.

Plaintiffs also argue that the ordinances are facially invalid because the City is discriminating against public payphones in its efforts to combat criminal activity. In the process, the City is reducing the number of public payphones available and discriminating against the free speech rights of (1) people who need to communicate when walking about the city, (2) those who need to communicate while driving, and (3) people who are too poor to buy their own phones and instead rely on public payphones. This danger, however, has nothing to do with censorship, but merely with the First Amendment dangers inherent in limiting the quantum of payphones in the city. Because these allegations do not raise the danger of "chill," they likewise do not warrant resort to the extraordinary measure of a facial challenge. Accordingly, we grant the City's motion to dismiss Count I.[9]

### 2. Count II—Equal Protection

At bottom, plaintiffs' equal protection argument runs something like this: in an effort to generate revenue, the City is (as a general matter) denying zoning exceptions to public payphone operators who would like to install and maintain phones on private property (from which the City will receive no income), while at the same time entering into franchise agreements with public payphone operators who seek to install payphones on the public way (from which the City will receive a portion of the proceeds). For example, the City is denying (and revoking) exceptions for payphones on private property while entering into franchise agreements on adjacent public property. Additionally, City officials are discriminating against plaintiffs by removing even their compliant phones on private property, leaving intact other noncompliant payphones (owned by companies that have entered into franchise agreements with the City) in the same location. According to plaintiffs, this conduct violates their equal protection rights.[10]

In seeking to dismiss Count II, the City contends that plaintiffs have failed to allege that they are being discriminated against based on their membership in a particular group and that they have failed to allege denial of a right, privilege or immunity guaranteed by the Constitution. In fact, plaintiffs have failed to define the class to which they belong and the manner in which that class is being subject to discriminatory treatment. Plaintiffs' allegations that the City is discriminating against *payphones* located on private property in favor of *payphones* located on the public way misses the mark, since it is not the payphones that are bringing suit, but their owners. These owners, in turn, do

---

**9.** This opinion should not be construed to hold that public payphones are not entitled to First Amendment protection. While we recognize the obvious connection between speech and public payphones, we simply conclude that these plaintiffs have failed to articulate a risk of censorship justifying a facial challenge to the Ordinances at issue. That is not to say that a different plaintiff might not be able to state a First Amendment claim.

**10.** Plaintiffs also allege that the City's failure to similarly regulate other telecommunication devices, such as cellular phones and pagers, and to prohibit or limit other coin operated devices and other items that obstruct the public way and around which people may congregate, such as telephone poles and advertising benches, violates the Fourteenth Amendment's guarantee of equal protection. As the Seventh Circuit remarked in *Graff*, the question, for equal protection purposes, is whether the different treatment afforded the items identified by a plaintiff rests upon "conceivable" and "rational" reasons. See *Graff*, 9 F.3d at 1326 (emphasizing the propriety of treating newsstands and sidewalk cafes differently, given their obvious differences, and observing that "[t]he question is whether the different treatment of newsstands and cafes occupying the public sidewalks are for 'conceivable' and 'rational' reasons."). Like the *Graff* court, we can conceive of many rational reasons for treating cellular phones and telephone poles differently from public payphones. Accordingly, and mindful of the fact that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," we conclude that these elements of Count II bear no further scrutiny. See, e.g., *F.C.C. v. Beach Commun. Inc.*, —— U.S. ——, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

not fall into neat groups of those who are maintaining payphones exclusively on private property and those who install payphones on the public way. Instead, it is clear from the complaint that many companies operate payphones on both public and private property.

However, giving the complaint a liberal, indeed a generous, reading, we can discern the outlines of a cognizable class with a more limited claim than that outlined (dimly) in plaintiffs' briefs. Plaintiffs have alleged that the City has removed phones owned by their operators that had either received exceptions or which were on appeal, while leaving intact illegal phones located on private property and owned by providers who also have franchises. Cmplt. at ¶¶ 46 & 47. Because plaintiffs have alleged that the City is purposefully discriminating against them in favor of other similarly situated payphone operators based on their refusal to enter into franchise agreements, they have stated an equal protection claim.

### 3. Count III—Due Process

Defendants seek to dismiss plaintiffs' substantive and procedural due process claims, arguing (1) that the ordinances are immune to substantive due process attack because they are rational on their face, (2) that plaintiffs' procedural due process challenge must fail because they have failed to identify a property interest, and (3) that no due process challenge lies because adequate state law remedies are available. We address these arguments in turn.

### (a) Substantive Due Process

■ Plaintiffs assert that the twin ordinances violate their substantive due process rights because they have no deterrent effect on crime and are simply irrational.[11] *See Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 467 (7th Cir.1988) (to violate substantive due process, legislation must be arbitrary and irrational). In assailing plaintiffs' substantive due process claim, the City contends that its ordinances are obviously rational:

The ordinances seek to target "problem phones" based on community input and

aldermanic recommendations. That some phones, due to local traffic and residential patterns and other social factors, are more problematic than others, and are therefore removed, demonstrates the narrow tailoring of the ordinance, not its irrationality.

Defendant's Memorandum in Support of Motion to Dismiss at 7–8. As is evident from the parties' arguments, this issue cannot be resolved on a motion to dismiss, but must be addressed on its merits. We therefore deny the City's motion to dismiss the substantive due process claims contained in Count III.

### (b) Procedural Due Process

■ Plaintiffs claim that the Zoning Ordinance violates their due process rights because the Zoning Administrator can deny zoning exceptions without a hearing and in practice relies solely upon the recommendation of the affected alderman. The City attacks these claims on the grounds that plaintiffs have failed to allege a protectable property interest and that, in any event, adequate state law remedies are available to plaintiffs. We need not dwell on the former contention, since it is evident that the plaintiffs have a property interest in their right to enter into agreements to place payphones on private property and to maintain phones on those locations where they have in fact obtained such agreements.

■ As for the City's latter assertion, plaintiffs' ability to bring these claims in federal court does not turn upon the availability of adequate state law remedies. Here, plaintiffs challenge the legislation itself. *See Zinermon v. Burt*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Under prevailing jurisprudence, the availability of an adequate post-deprivation remedy is only relevant if pre-deprivation process is unavailable or impracticable, such as in situations where the deprivation is the result of random, negligent, or unauthorized conduct. *See e.g., Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Plaintiffs allegations however, describe a scenario where the actions complained of are authorized by statute and additional pre-depriva-

---

11. Indeed, the consortium even alleges the existence of evidence demonstrating that the ordi-

nances have not had any meaningful effect on criminal activity.

tion process would be possible.[12] Because plaintiffs' allegations contest the authorized procedure, the City's motion to dismiss these claims is denied.

 The City's point is better taken, however, with respect to plaintiffs' allegations that the ordinances violate procedural due process because, in practice, (1) the Zoning Administrator and Director of Revenue have not abided by the procedures set forth in the Zoning Ordinance when evaluating exception applications and (2) the Zoning Administrator and Director of Revenue have removed payphones that were in compliance with the ordinances and/or payphones that had been granted exceptions or were under appeal. In short, plaintiffs allege that city officials have purposefully abrogated the statute. When an official behaves in a random and unauthorized manner during the course of established predeprivation procedures, as alleged here, such conduct may, or may not, fall within the rule of *Parratt* and warrant consideration of the available state remedies. Where the alleged violation is properly considered to be random or unauthorized, additional pre-deprivation procedure would be irrelevant, and courts should consider the availability of adequate post-deprivation remedies before permitting a due process claim to go forward. *See, Easter House v. Felder*, 910 F.2d 1387, 1398–1405 (7th Cir.1990) (conduct of high-level officials during pre-deprivation process was random and unauthorized, thus falling within *Parratt* and warranting consideration of available state remedies), *cert. denied*, 498 U.S. 1067, 111 S.Ct. 783, 112 L.Ed.2d 846 (1991). On the other hand, where the wrong is effectively authorized, then the pre-deprivation process is at issue and the court need not evaluate the post-deprivation options available to plaintiff. *See Zinermon*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (consideration of post-deprivation remedies unnecessary because, although wrongful, conduct of high-level officials during pre-deprivation procedures was foreseeable and subject to further

safeguards and could therefore not be considered "random" or "unauthorized" within the meaning of *Parratt* ).

As alleged, the facts here are more similar to *Zinermon* than to *Easter House*. In both *Zinermon* and the case at hand, the official who allegedly behaved wrongfully was vested with the power to deprive the plaintiffs of the property at stake. As such, the charged deprivation was foreseeable, occurred at a predictable juncture, and could not be said to be "unauthorized." Moreover, additional procedural safeguards might have been employed by the government actor to prevent just the sort of deprivation alleged. We therefore conclude that, on the facts as alleged, the violations may well be found to be authorized. Accordingly, *Zinermon* governs and we need not consider the availability of post-deprivation remedies at this juncture. This portion of Count III therefore survives.

### 4. Count IV—Commerce Clause

 The United States Constitution provides that "Congress shall have Power ... to regulate Commerce with foreign Nations, and among the several States...." U.S. CONST., Art. I, § 8, cl. 3. In addition, the Commerce Clause implicitly confines the states' power to burden interstate commerce. *See, e.g., Oregon Waste Systems v. Dept. of Env. Quality,* —— U.S. ——, ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994). Accordingly, the "dormant" Commerce Clause prohibits a state or local "statute [that] regulates evenhandedly to effectuate a legitimate local public interest" if it imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

 The City seeks to dismiss plaintiffs' Commerce Clause claim, arguing that "[t]he few interstate calls that might have been placed on plaintiffs' phones had they not been removed will presumably be placed on other phones," and therefore the ordinances have "virtually no effect on interstate com-

---

**12.** Indeed, part and parcel of plaintiffs' claim is the notion that additional pre-deprivation safeguards should be implemented.

merce." [13] Defendants' Memorandum in Support of Motion to Dismiss at 13. Plaintiffs have alleged that roughly 5% of calls placed from their phones are interstate and that a still larger percentage affect interstate commerce. Whether these calls will simply be transferred to other phones, however, is a fact question not properly before us on this motion to dismiss. Moreover, because the remainder of the *Pike* analysis is fact-intensive, dismissal of this claim is otherwise inappropriate. We therefore deny the City's motion to dismiss Count IV.[14]

### 5. Count V—Takings Clause

■ In Count V of their complaint, plaintiffs assert that the City's seizure of their payphones pursuant to unconstitutional ordinances constitute unlawful takings under the Fifth Amendment, which provides that "... nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. The City contends that plaintiffs have failed to state a claim, since the City is obviously empowered to remove property which violates local ordinances and, more importantly, the City gave plaintiffs notice of its intention to remove the unauthorized phones, providing them with an opportunity to avoid seizure. The City thus argues that its actions no more constitute unlawful takings than do seizures of cars parked in tow zones. Finally, the City maintains that, because it is simply storing the seized payphones in a warehouse, there has been no taking for public use, as required for a claim to fall within the ambit of the Takings Clause.

■ Although the City's arguments largely miss the point, they are understandable in light of the plaintiffs' inadequate pleading. In their complaint, plaintiffs neglect to articulate what property has been "taken"— whether the phones themselves or the plaintiffs' interest in placing their phones on the private property locations at issue. Likewise, plaintiffs fail to identify the legal theory under which they believe they can prevail— whether this is a physical or regulatory taking, and, if the latter, whether the ordinances should be analyzed under the Supreme Court's zoning, licensing, or other, rubric. While we are not inclined to plead their case for them, it is clear from the totality of the complaint that plaintiffs may be able to present some set of facts under which they could succeed under the takings clause. Indeed, "[a] zoning law effects a taking if (1) it does not substantially advance a legitimate governmental interest; or (2) it denies an owner economically viable use of his land." *Outdoor Systems, Inc. v. City of Mesa*, 997 F.2d 604 (9th Cir.1993) (citing *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)). Accordingly, despite plaintiffs' impressionistic pleading, and notwithstanding the obviously uphill battle they will have to wage in order to establish a taking under any legal theory, we deny the City's motion to dismiss Count V.

### 6. Count VI—Illegal Taxation

The Illinois Constitution provides that home rule units, like Chicago, "shall have only the power that the General Assembly may provide by law ... to license for revenue or impose taxes upon or measured by income or earnings or upon occupations." Ill. CONST. Art. 7, § 6(e). The General Assembly, in turn, has passed both the Municipal Telecommunications Excise tax, 65 ILCS 5/8–11–17, and the Municipal Telecommunications Carrier tax, 65 ILCS 5/8–11–2, generally limiting municipalities to taxing telecommunications carriers at a rate of 5% of gross receipts or gross charges received within city limits. In Count VI, plaintiffs allege that the Franchise Ordinance violates these acts because it has required franchi-

---

**13.** Because the City does not raise the issue of whether and to what extent phone calls constitute interstate commerce, we do not address this issue.

**14.** That is not to say that plaintiffs have a particularly strong claim. They decidedly do not. In

order to prevail, plaintiffs must not only demonstrate that interstate commerce is being burdened, but that the burden is "clearly excessive in relation to the putative local benefits." Given the deference accorded legislative judgments, this is a very difficult burden to meet.

sees to pay far more than 5% of their revenues to the City.

■ Although the City maintains that the Franchise Ordinance does not constitute a tax, it argues that if the Ordinance *is* a tax, as plaintiffs implicitly allege, then the Tax Injunction Act, 28 U.S.C. § 1341, precludes us from exercising jurisdiction over Count VI. The Tax Injunction Act (the "Act") provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state." *Id.* Because the plaintiffs clearly seek to enjoin the application of the Franchise Ordinance, the only question is whether the legislation constitutes a tax.

■ It is well settled that "[f]ederal law controls as to the definition of what is a tax to which the Tax Injunction Act applies." *Diginet, Inc. v. Western Union ATS,* 845 F.Supp. 1237, 1240 (N.D.Ill.1994). Notwithstanding the City's position, we conclude that the Franchise Ordinance constitutes a tax.[15]

As written, one of the Franchise Ordinance's seven stated purposes is "to generate revenue for the City." Title 10–28–265(b)(7). Moreover, plaintiffs allege that "[p]ursuant to the Franchise Ordinance and the Franchise Agreement drafted by the City, no payphone provider may operate public payphones on the public way unless the payphone provider pays the City a commission based on the gross revenue of the intrastate and interstate calls made from any pay telephone placed on the public way." Cmplt. at ¶ 41.[16]

■ It is axiomatic that "[a] characteristic of a tax is that it is imposed for revenue-raising purposes." *Id.* Moreover, courts have held that franchise fees based on a percentage of revenues constitute taxes. *See, e.g., Diginet, Inc. v. Western Union*

ATS, Inc., 958 F.2d 1388, 1399 (7th Cir.1992) (*"Diginet II"*) ("[i]f [a franchise fee] is calculated not just to recover a cost imposed on the municipality or its residents but to generate revenues that the municipality can use to offset unrelated costs or confer unrelated benefits, it is a tax, whatever its nominal designation," and thus the franchise fee at issue, which charged a percentage of revenues, was a tax.); *Keleher v. New England Telephone & Telegraph Co.,* 947 F.2d 547, 548–49 (2d Cir.1991) (charge of 2 1/2% of gross revenues of any utility company using and occupying city streets equalled a tax); *Yakima Valley Cablevision, Inc. v. F.C.C.,* 794 F.2d 737, 740–41, 744 & n. 24 (D.C.Cir. 1986) (cable franchise fees of 3–5% of gross revenues constituted a tax); *Robinson Protective Alarm Co. v. City of Philadelphia,* 581 F.2d 371, 372 (3d Cir.1978) (charge of 5% of gross earnings for central alarm station companies to use underground wires to transmit their signals amounted to tax). Here, there is no dispute that the City seeks to generate revenue by means of the Franchise Ordinance. (Indeed, this allegation is central to plaintiffs' equal protection claim.) Additionally, plaintiffs allege that the City routinely receives franchise fees of roughly 33% of payphone providers' revenues—an amount obviously in excess of the money needed to recover regulatory costs. Accordingly, on the facts as pleaded, we resolve that the Franchise Ordinance constitutes a tax. *See Diginet,* 845 F.Supp. 1237 (faced with similar facts, court found franchise fee to be tax and held that it lacked jurisdiction). That said, we lack jurisdiction to consider Count VI and it is dismissed.

## 7. Count VII—§ 1983

■ On the assumption that Counts I through V would be dismissed, the City sought to dismiss plaintiffs' § 1983 claim on

15. We are not persuaded by plaintiffs' plea that we simply defer to the City's characterization of the Franchise Ordinance. Indeed, such a request is ironic, given the fact that plaintiffs' allegations clearly depict the Franchise Ordinance as a tax. In light of their own pleadings and the posture of the case (i.e. a motion to dismiss wherein the Court is bound to take all well-pleaded allegations *as true* ), it borders on the absurd for the plaintiffs to argue that "Defen-

dants' admissions control and this Court has jurisdiction."

16. Plaintiffs also submit a sample franchise agreement supporting its charge that the franchise fee is calculated based on the percentage of a payphone provider's gross receipts. Cmplt. at Exh. D.

the theory that it could not survive without a constitutional violation. Because several of plaintiffs' constitutional claims are going forward, Count VII likewise endures.[17]

## B. Preliminary Injunction

 To prevail on a motion for a preliminary injunction, a plaintiff must demonstrate that (1) he has no adequate remedy at law, (2) he will suffer irreparable harm without the injunction, (3) he is likely to succeed on the merits, (4) the balance of harms to the parties weighs in his favor, and (5) the public interest will be better served by having the injunction issue. *See Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–388 (7th Cir.1984). In seeking a preliminary injunction, plaintiffs rely primarily on their First Amendment and illegal taxation claims. Consequently, our dismissal of these claims substantially weakens plaintiffs' request for immediate injunctive relief. This reality, coupled with the fact that plaintiffs face significant hurdles in prevailing on their remaining constitutional claims, persuades us to deny plaintiffs' motion for a preliminary injunction. *See U.S. v. Rural Electric Convenience Cooperative,* 922 F.2d 429, 432 (7th Cir.1991) (plaintiff must satisfy every element in order to receive a preliminary injunction).

## III. Conclusion

For the foregoing reasons we deny plaintiffs' motion for a preliminary injunction and grant in part and deny in part defendants' motion to dismiss. It is so ordered.

---

17. However, we hereby dismiss defendants Grady and Rice from this action. Both defendants have been sued exclusively in their official capacities. It is well-settled that official capacity suits are to be construed as suits against the governmental entity itself. *See Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985).